NOTICE

Decision filed 12/16/09. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-09-0447

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| CARTER KALBFLEISCH, by and Through His Next Friends, CHRISTOPHER KALBFLEISCH and MELISSA KALBFLEISCH, | ) Appeal from the ) Circuit Court of ) Monroe County. ) |
| Plaintiff-Appellee, | ) ) |
| v. | ) No. 09-CH-57 ) |
| COLUMBIA COMMUNITY UNIT SCHOOL DISTRICT UNIT NO. 4, | ) ) Honorable |
| Defendant-Appellant. | ) Dennis B. Doyle, ) Judge, presiding. |

_____

JUSTICE WEXSTTEN delivered the opinion of the court:

This is an interlocutory appeal taken pursuant to Supreme Court Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)). At issue in this case is whether the Monroe County circuit court properly ordered a preliminary injunction to compel the defendant-appellant, Columbia Community Unit School District Unit No. 4 (the school district), to permit the plaintiff-appellee, Carter Kalbfleisch, a five-year-old child with autism, to bring his service dog with him to school pursuant to section 14-6.02 of the School Code (105 ILCS 5/14-6.02 (West 2008)).

BACKGROUND

On July 17, 2009, Carter, by his next friends, Christopher Kalbfleisch and Melissa Kalbfleisch, filed a verified complaint for injunctive relief and a verified motion for a preliminary injunction, claiming that he had a right under section 14-6.02 of the School Code (the service animal statute) to bring his service dog with him to Parkview Elementary School

1

(the school). That section provides as follows:

"Service animals such as guide dogs, signal dogs[,] or any other animal individually trained to perform tasks for the benefit of a student with a disability shall be permitted to accompany that student at all school functions, whether in or outside the classroom." 105 ILCS 5/14-6.02 (West 2008).

On July 21, 2009, the school district filed a notice of removal, alleging that the case arose under federal law, and the case was removed to the United States District Court for the Southern District of Illinois (the district court). Carter filed a motion to remand, and on August 5, 2009, the district court granted the motion and remanded the case to the circuit court after finding that Carter's claim did not arise under and was not preempted by federal law. *Kalbfleisch v. Columbia Community Unit School District Unit No. 4*, 644 F. Supp. 2d 1084 (S.D. Ill. 2009).

On August 13, 2009, the school district filed a motion to dismiss the verified complaint for injunctive relief and the motion for a preliminary injunction, contending that because Carter failed to exhaust his administrative remedies, the circuit court lacked jurisdiction over the subject matter in the complaint and the motion for a preliminary injunction. On August 19, 2009, the circuit court held a hearing on the school district's motion to dismiss. The court denied the motion and gave the school district leave to file its answer that day. After a brief recess, the school district filed its answer.

The next day, the court held a hearing on Carter's motion for a preliminary injunction, where the following evidence was presented.

Carter's mother, the only witness to testify on Carter's behalf, stated that Carter was diagnosed with medium-to-severe autism at 18 months of age. She described Carter's behavior prior to having his service dog as follows: Carter was prone to having tantrums on a daily basis; he suffered from an eating disorder called pica, a pattern of eating nonfood

2

materials; he would refuse to walk when he was taken to public places; he sporadically would take off running; he could not fall asleep on his own and, once asleep, woke up approximately every hour; he did not communicate with anyone; and he was unable to focus.

She said Carter's tantrums involved kicking, screaming, and biting, often occurred at dinner and would last approximately one hour, and also occurred in the morning at least three times per week and would last approximately two hours. She testified that because of Carter's eating disorder he had tried to eat such items as rocks, mulch, grass, trash, cleaning supplies, batteries, and coins and had drunk from the toilet. She indicated that when the family would take Carter to public places, such as parks, stores, and restaurants, Carter would throw himself down on the ground and refuse to walk. As a result, Carter's family was unable to take him to public places, and the family was homebound.

She said that Carter had a tendency to sporadically take off running, sometimes into a pond near their house or into a nearby road with traffic, that Carter would not fall asleep on his own and would wake up about every hour, and that because of this, she had to sleep in his bed with him for the previous two years. She said that if she did leave his room after he had fallen asleep, she would lock his bedroom door to give her more time to respond if Carter woke up and tried to leave the room. On one occasion, however, she was not able to respond quickly enough, and Carter was able to get out of the home and into the pond in the middle of winter.

She testified that Carter did not communicate with other students on his own and that he did not speak any meaningful words but would mumble different sounds. She described getting Carter to focus as almost impossible. She stated he would distract himself by self-stimulation, or stimming, with his hands or other objects, and would stare off into the distance when people tried to communicate with him.

She stated that when Carter was around three years old, his doctor suggested that

3

Carter obtain a service dog. After Carter's mother researched the issue and exhausted all other possibilities, Carter's family decided to apply for a service dog with Wilderwood Service Dogs (Wilderwood), a company that provided service dogs trained to aid patients with neurological disorders. Carter's application was extensive, and once approved, he was placed on a two-year waiting list for a service dog. Carter has a prescription for a service dog from two different doctors.

She testified that after Carter's application had been accepted, Carter's family sent in a video of Carter and a sample of his worn clothing. She indicated that these articles were used to train Carter's service dog, Corbin, to become acquainted with Carter's appearance, voice, and smell. It was Carter's mother's understanding that Corbin would sleep with Carter's clothing and would watch the video of Carter repeatedly. She stated that Corbin was trained to understand 70 commands and was specifically trained for Carter's pica, impulse running, night awakenings, and tantrums. She stated that Corbin is a Bouvier breed, which is considered to be a hypoallergenic dog. Carter's mother understood this to mean that people who are allergic to dogs with fur would not be allergic to hypoallergenic dogs because they have hair rather than fur.

On July 16, 2009, after approximately two years of being on a waiting list, Carter received Corbin. Wilderwood brought Corbin to Carter's area so that Carter's mother and father and anyone from the school could be trained to handle him. The training lasted eight days, totaling approximately 80 hours, and Carter's mother and father attended the entire training. Carter's aide at school also attended the training for two hours.

After the training, Carter's mother and father took an examination and passed. They are currently awaiting their certificates from the State of Illinois for completing the training and passing the examination. As a result of the training, Carter's mother and father are certified dog handlers. According to Carter's mother, this means she is qualified to train

4

other people in their own comfortable environment. For example, she could train her mother to handle Corbin in her mother's home but not anywhere else. She said that as of the time of her testimony no one at the school was trained to handle Corbin but that she was able and willing to train the staff to do so and was willing to remain with Carter and Corbin at school if needed.

She testified that after having Corbin for a month or so, Carter was a much happier child; that his tantrums have minimized to a couple per week and his recovery time has been reduced to minutes, compared to the half hour to hour it used to take to reconcile the situation; that Corbin will physically take Carter down if he takes off running into a dangerous situation, like into traffic, and as a result, Carter does not try running for the road anymore; that by the third night of training, Carter was able to sleep without his mother in the room because Corbin would calm him when he woke up; that Corbin draws Carter out of his stimming by batting him with his nose, which allows Carter to focus more; that the family was able to take Carter to Six Flags without incident and on a weekend vacation to Mark Twain Lake; and that on the second-to-last day of training, Carter, for the first time in his life, used meaningful words when he told Corbin to "wait" and "hold."

She also testified that when Carter's grandfather was hospitalized, Carter and Corbin were separated for a few days for about eight hours a day. She said that this disrupted their working relationship because Corbin was not responding to his commands and that Carter went back to having more tantrums. She stated that after a few days of coaching, their relationship was back to normal. She testified that, in her opinion, separating Carter and Corbin would greatly harm their working relationship and that if they are separated, Corbin would become a pet, as opposed to a service animal, and Carter would suffer. She stated that Carter and Corbin share a working relationship and a very strong bond and that in order to maintain that bond and relationship, Corbin needs to be with Carter every day as a part of his

5

daily routines.

She stated that she notified Carter's special education coordinator that Carter was going to obtain a service dog. She did so the first time after Carter's application for a service dog had been approved. She said that at that time she asked what she needed to do to prepare the school for the dog's arrival and was told that when the start of school was closer, the school would look into any issues that might arise. She testified that she subsequently spoke with the special education coordinator on several other occasions about Carter's service dog.

On March 11, 2009, Carter's annual individualized education plan (IEP) meeting was held. At the conclusion of the IEP meeting, Carter's attorney asked whether the school would allow a dog at the school, and the attorney was informed that the school's superintendent handled those types of policy considerations. Carter's mother stated that she was informed at this meeting that Carter would not be allowed to bring his service dog to school but that she was unable to get the school to give her this message in writing. She indicated that she tried on several other occasions to get something in writing indicating that Carter would not be able to bring his service dog to school but that her efforts failed until June 2009. She said she had filed complaints against the school district with the Illinois Department of Human Rights, the United States Department of Education, and the Illinois State Board of Education.

The school district presented several witnesses: the director of special education for the school district, Carter's case manager, the mother of another child enrolled to attend Carter's school, the principal of Carter's school, and the superintendent of Carter's school.

Carter's case manager testified that Carter's mother told her during the summer of 2008 that Carter was applying for a service dog, that she believed having a dog in school would be disruptive, and that Carter had an individual aide at school to ensure that Carter's needs were met. Carter's principal testified that the school had a policy of allowing no animals at school and that on the last day Carter attended his school, he did not have a dog

6

with him.

The mother of another child enrolled to attend the morning session of preschool at the school testified that her child has a rare lung disease, that her child is highly allergic to dogs, that the school district promised her at her child's IEP meeting on August 18, 2009, that her child would not be exposed to any animals, and that if there was a dog in her child's classroom, her child would not go to school. The school district's superintendent testified that in June he denied Carter's request to bring his service dog to school.

After hearing all the evidence, the court issued a preliminary injunction but deferred its entry until the following Monday, August 24, 2009, when a hearing on how to implement Carter's service dog at school would be held, because issuing it that day would be too much of a hardship on the school district. The following Monday, the school district filed a motion to stay, requesting the court to stay its order granting the motion for a preliminary injunction, pending the resolution of its appeal. The court denied the school district's motion and entered the order for a preliminary injunction enjoining the school district from preventing Carter from attending school while being accompanied by his service dog under the service animal statute. The court made the order effective September 14, 2009. On the same day, the school district filed its notice of appeal pursuant to Supreme Court Rule 307(a)(1).

On August 25, 2009, the school district filed a motion to stay the preliminary injunction pending the appeal with this court. We denied that motion on September 1, 2009. On October 26, 2009, Carter filed a motion to strike portions of the school district's reply brief. On November 9, 2009, we issued an order taking the motion to strike with the case. We now grant that motion, and we have not considered those portions of the school district's reply brief in reaching our decision. Pursuant to Supreme Court Rule 345 (210 Ill. 2d R. 345), the Illinois Attorney General's office filed a brief *amicus curiae* on Carter's behalf.

ANALYSIS

The school district raises three points on appeal. First, the school district contends that because Carter failed to exhaust his administrative remedies prior to bringing suit, the circuit court lacked jurisdiction to enter a preliminary injunction. Second, the school district avers that Carter failed to meet the requirements necessary to obtain a preliminary injunction. And finally, the school district argues that the circuit court failed to maintain the parties' status quo and properly consider the public interest in balancing the equities between the parties.

On appeal from an order granting or denying a preliminary injunction, " 'we examine only whether the party seeking the injunction has demonstrated a *prima facie* case that there is a fair question concerning the existence of the claimed rights.' " *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 62 (2006) (quoting *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 177 (2002)). Generally, we review this decision for an abuse of discretion (*Mohanty*, 225 Ill. 2d at 63), but where "the trial court's determination regarding the grant of a preliminary injunction involves the interpretation of statutory law, the appropriate standard of review is *de novo*." *Caro v. Blagojevich*, 385 Ill. App. 3d 704, 709 (2008), *appeal allowed*, 231 Ill. 2d 629 (2009). Thus, we review the trial court's interpretation of the service animal statute *de novo* but review its findings of fact for an abuse of discretion.

The purpose of a preliminary injunction is not to determine controverted rights or decide the merits of a case, but rather, its function is to preserve the rights of the parties or the state of affairs legally existing just prior to the motion for a preliminary injunction until the case can be decided on the merits. *Harper v. Missouri Pacific R.R. Co.*, 264 Ill. App. 3d 238, 249 (1994); *Arends v. Naughton*, 11 Ill. App. 2d 227, 236 (1956); but see *Heerey v. Berke*, 179 Ill. App. 3d 927, 941 (1989) ("The purpose of injunctive relief is to *either* relieve the plaintiff of severe and irreparable injury *or* to [*sic*] preserve the status quo ***"

8

(emphasis added)). Granting a preliminary injunction is used to prevent a threatened wrong or continuing injury and preserve the status quo with the least injury to the parties concerned. *In re Marriage of Jawad*, 326 Ill. App. 3d 141, 154 (2001); *Limestone Development Corp. v. Village of Lemont*, 284 Ill. App. 3d 848, 853 (1996).

The party seeking a preliminary injunction is required to establish four factors before an injunction will be granted: (1) a clearly ascertained right in need of protection, (2) an irreparable injury in the absence of an injunction, (3) an inadequate remedy at law, and (4) a likelihood of success on the merits. *Mohanty*, 225 Ill. 2d at 62.

## I. Exhaustion of Administrative Remedies

The school district's first contention is that the circuit court lacked jurisdiction to issue a preliminary injunction because Carter failed to exhaust his administrative remedies. We find it unnecessary to determine whether Carter failed to exhaust his administrative remedies because the circuit court found that Carter would be subjected to irreparable harm and that any other process would be inadequate due to time constraints. See *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 499 (2008) ("[E]xhaustion is not required if the administrative remedy is inadequate or futile or in instances where the litigant will be subjected to irreparable injury due to lengthy administrative procedures that fail to provide interim relief"). As explained more fully below, we find that the circuit court did not abuse its discretion in finding that Carter would suffer irreparable harm by proceeding through an administrative process. Thus, the circuit court did not abuse its discretion in issuing the preliminary injunction. Still, even if Carter's claim was pending in an administrative process, we find under that under the circumstances of this case, the circuit court still would have had jurisdiction to enter a preliminary injunction pending the completion of the administrative process. See *Kurtzworth v. Illinois Racing Board*, 92 Ill. App. 3d 564, 584 (1981) ("[W]hen the proper circumstances are presented it, a court exercising traditional and inherent chancery

9

powers may intervene in the administrative process by furnishing the provisional relief of a preliminary injunction *** pending the completion of the administrative hearing processes ***"); *Bartelstein v. Goodman*, 340 Ill. App. 51, 54 (1950) (" 'If the remedy in equity is more adequate because of some special circumstance of the situation, the jurisdiction of equity will be sustained' " (quoting *Cordell v. Solomon*, 234 Ill. App. 430, 439 (1924))).

In any event, we find it questionable whether the school district has even preserved this issue for our review. The denial of a motion to dismiss by itself is not a final and appealable order but, rather, is an interlocutory order not appealable under any of the exceptions set forth in Rule 307. *In re Petition of Filippelli*, 207 Ill. App. 3d 813, 817-18 (1990); *Rosinia v. Gusmano*, 90 Ill. App. 3d 882, 886-87 (1980). "Rule 307 allows only the review of the order from which a party takes an appeal, and such an appeal does not open the door to a general review of all orders entered by the trial court up to the date of the order that is appealed." *In re Petition of Filippelli*, 207 Ill. App. 3d at 818; but see *Sarah Bush Lincoln Health Center v. Berlin*, 268 Ill. App. 3d 184, 187 (1994) (holding that "the proper scope of the review under Rule 307 is to review any prior error that bears directly upon the question of whether the order on appeal was proper"). Here, the denial of the school district's motion to dismiss raising the exhaustion-of-administrative-remedies argument was an interlocutory order not generally appealable, and no right of appeal was granted pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308). Rather, the school district appealed the circuit court's order granting the preliminary injunction pursuant to Supreme Court Rule 307(a)(1), which provides for an interlocutory appeal as of right when an injunction is granted. The school district did not raise the exhaustion-of-administrative-remedies argument at the hearing on the motion for a preliminary injunction, it was not considered by the circuit court at that hearing, and taking this appeal did not open the door to a review of the ruling on the motion to dismiss.

## II. Preliminary Injunction Requirements

Next, the school district contends that Carter failed to establish two of the four elements necessary for a preliminary injunction, *i.e.*, that Carter failed to establish a likelihood of success on the merits and that he would suffer irreparable harm.

### A. *Likelihood of Success*

The school district contends that Carter did not establish that he had a likelihood of success on the merits of his underlying complaint. It contends that Carter failed to establish that Corbin was a service dog and that we should construe the service animal statute as requiring an educational benefit. We disagree.

To establish a likelihood of success, Carter need only raise a fair question regarding the existence of a claimed right and a fair question that he will be entitled to the relief prayed for if the proof sustains the allegations. See *Fischer v. Brombolich*, 207 Ill. App. 3d 1053, 1066 (1991). Here, the school district does not contest that Carter has a clearly ascertained right in need of protection under the service animal statute. As provided above, that statute provides as follows:

> "Service animals such as guide dogs, signal dogs[,] or any other animal individually trained to perform tasks for the benefit of a student with a disability shall be permitted to accompany that student at all school functions, whether in or outside the classroom." 105 ILCS 5/14-6.02 (West 2008).

It is undisputed that Carter is a student with a disability. The school district argues, however, that Carter did not establish that Corbin was a service animal. We note that Carter was not required to establish that Corbin was a service animal, but rather, he only had to raise a fair question regarding the existence of his claimed right. Without deciding the merit of Carter's claim, we have reviewed the service animal statute *de novo* and have determined that Carter has raised a fair question about the existence of his right under the service animal

11

statute.

When we interpret a statute, the fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *Rosewood Care Center, Inc. v. Caterpillar, Inc.*, 226 Ill. 2d 559, 567 (2007). In that process, the language of the statute is the best indicator of legislative intent, and we give that language its plain and ordinary meaning. *Caterpillar, Inc.*, 226 Ill. 2d at 567. "We may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent." *Caterpillar, Inc.*, 226 Ill. 2d at 567.

Carter's mother testified that a video of Carter and a sample of his clothing were sent to Wilderwood to familiarize Corbin with Carter's appearance and smell, that Corbin was trained to understand 70 commands, and that Corbin was trained for Carter's pica, impulse running, night awakenings, and tantrums. She also testified that Carter has benefited from having Corbin by having reduced tantrums and now needs less time to recover from his tantrums, that Corbin is trained to physically take Carter down if he takes off running into a dangerous situation, that Corbin had reduced Carter's night awakenings, and that Corbin draws Carter out of his stimming. This testimony was sufficient to raise a fair question regarding whether Corbin was a "guide dog[], signal dog[][,] or any other animal individually trained to perform tasks for the benefit" of Carter (105 ILCS 5/14-6.02 (West 2008)).

As to the school district's argument that we should construe the service animal statute as requiring an educational benefit, we find no such requirement under a plain reading of the statute. The service animal statute requires that the service animal be "individually trained to perform tasks for the *benefit of a student* with a disability." (Emphasis added.) 105 ILCS 5/14-6.02 (West 2008). The language of the statute does not include the term "educational benefit," and we " 'should not attempt to read a statute other than in the manner in which it was written' " (*Caterpillar, Inc.*, 226 Ill. 2d at 567 (quoting *Ultsch v. Illinois Municipal*

12

*Retirement Fund*, 226 Ill. 2d 169, 190 (2007))). Nonetheless, Carter's mother testified that Corbin draws Carter out of his stimming, which allows him to focus more on completing his tasks and certainly would be an educational benefit. Reduced tantrums and a faster recovery time would also provide Carter an educational benefit. Thus, we find that the circuit court did not err in finding a likelihood of success on the merits of Carter's claim.

## B. *Irreparable Injury*

The school district contends that Carter did not establish that he would suffer a valid irreparable harm if a preliminary injunction were not granted. It argues that Carter's harm is self-inflicted because Carter can attend school without his service dog if he so chooses. It argues that self-inflicted harm cannot be irreparable harm.

"An alleged injury is defined as irreparable when it is of such nature that the injured party cannot be adequately compensated therefor in damages or when damages cannot be measured by any certain pecuniary standard." *Cross Wood Products, Inc. v. Suter*, 97 Ill. App. 3d 282, 286 (1981). Here, the circuit court did not abuse its discretion in finding that Carter would suffer irreparable harm if Corbin was not allowed to attend school with him. Carter's mother testified that during the period of time Carter and Corbin were separated while Carter's grandfather was hospitalized, Carter and Corbin's working relationship deteriorated. She said that Corbin became less responsive to his commands and that Carter's tantrums increased. She stated that in order for Carter and Corbin to maintain their bond, Corbin needed to be with Carter every day as a part of his daily routines. This evidence was not rebutted by the school district, and the injury is not compensable in damages, or measurable by any pecuniary standard, and is exactly the type of harm that a preliminary injunction is used to prevent.

Further, the school district's argument that Carter's harm is self-inflicted is without merit. As established above, Carter has raised a fair question regarding the existence of his

13

right to take Corbin with him to school under the service animal statute. By attending school without Corbin, Carter would suffer irreparable harm as a result of being separated from Corbin during school hours. The school district cannot deny Carter access to school with his service dog and then claim that his harm is self-inflicted.

### III. Status Quo/Balance of Hardships

In its third point, the school district raises two separate arguments: (1) the circuit court abused its discretion in issuing a preliminary injunction because it altered the status quo, and (2) the circuit court abused its discretion in balancing the hardships in favor of Carter because it failed to take into consideration the public interest.

### A. *Status Quo*

The school district contends that the injunction was improper because it allegedly altered the status quo between the parties. The school district argues that the status quo was Carter attending school without a service dog because Carter attended school last year without a service dog. Carter, on the other hand, defines the status quo as the school district "not infringing upon Carter's rights secured to him by law." It argues that the school district, "by denying Carter access to its school while being accompanied by Corbin, has changed the status quo by denying Carter a right secured to him by the laws of the State of Illinois."

Under Illinois law, it is generally proper to issue a preliminary injunction that will preserve the status quo of the parties rather than alter it. *People v. Van Tran Electric Corp.*, 152 Ill. App. 3d 175, 183 (1987). Often this is done by keeping all actions at rest, but sometimes it happens that the status quo is not a condition of rest but, rather, is one of action and the condition of rest is exactly what will inflict the irreparable harm. *Brooks v. La Salle National Bank*, 11 Ill. App. 3d 791, 799 (1973). Still, in certain circumstances, altering the status quo might be appropriate. See *Keystone Chevrolet Co. v. Kirk*, 69 Ill. 2d 483, 486 (1978) ("Where the effect of a temporary injunction will be to alter the status quo, the party

14

seeking it must first establish the probability of his ultimate success on the merits"); *Citizens Utilities Co. of Illinois v. O'Connor*, 121 Ill. App. 3d 533, 535 (1984) (citing *Kirk* for the proposition that where the party seeking the temporary restraining order would change the status quo, it must first establish the probability of its ultimate success on the merits); *Lakeshore Hills, Inc. v. Adcox*, 90 Ill. App. 3d 609, 611 (1980) ("The injunction here altered rather than preserved the status quo. However, this does not require reversal").

"[The term] [']status quo['] has been the subject of countless, often inconsistent, interpretations." *Electronic Design & Manufacturing, Inc. v. Konopka*, 272 Ill. App. 3d 410, 415 n.2 (1995). It has often been defined as the last actual, peaceful, noncontested status that preceded the pending controversy. *Limestone Development Corp.*, 284 Ill. App. 3d at 853. Another interpretation of the term, however, is the condition necessary to prevent a dissipation or destruction of the property in question. *In re Marriage of Joerger*, 221 Ill. App. 3d 400, 409 (1991); *Gannett Outdoor of Chicago v. Baise*, 163 Ill. App. 3d 717, 721 (1987); *Home Savings & Loan Ass'n of Joliet v. Samuel T. Isaac & Associates, Inc.*, 99 Ill. App. 3d 795, 802-03 (1981). Under either interpretation, we believe that "[t]he preliminary injunction is designed to prevent a threatened wrong or the further perpetration of an injurious act" (*Kolstad v. Rankin*, 179 Ill. App. 3d 1022, 1034 (1989) (citing *Toushin v. City of Chicago*, 23 Ill. App. 3d 797, 801 (1974))). In this case, that was done by issuing the preliminary injunction.

Once Carter established that he met the requirements necessary for a preliminary injunction, the circuit court did not abuse its discretion in issuing a preliminary injunction that prevented the threatened harm and maintained the status quo with the least injury to the parties. See *In re Marriage of Jawad*, 326 Ill. App. 3d at 154; *Limestone Development Corp.*, 284 Ill. App. 3d at 853; see also *Kolstad*, 179 Ill. App. 3d at 1034 (rejecting the defendant's argument that the status quo was the set of circumstances immediately prior to

15

the plaintiff's complaint where the defendant ignored "the fact that the failure to issue a preliminary injunction could result in injury which had not previously occurred" and finding that the preliminary injunction maintained the status quo by preventing a threatened wrong). Here, the status quo was not a condition of rest but, rather, was a condition of action that was necessary to prevent irreparable harm. See *In re Adoption of Scraggs*, 125 Ill. 2d 382, 388-89 (1988); *Continental Cablevision of Cook County, Inc. v. Miller*, 238 Ill. App. 3d 774, 790 (1992); *American Telephone & Telegraph Co. v. Village of Arlington Heights*, 174 Ill. App. 3d 381, 387-88 (1988); *Davis v. East St. Louis & Interurban Water Co.*, 133 Ill. App. 2d 801, 804-05 (1971).

The school district argues that allowing Carter to attend school with Corbin cannot be the status quo because it was never the actual status. To hold that the status quo was Carter not attending school with his service dog because the service dog never attended school last year would leave Carter with no avenue to prevent suffering irreparable harm–the purpose behind issuing a preliminary injunction in the first place. *E.g.*, *Wilson v. Wilson*, 217 Ill. App. 3d 844, 849 (1991); *Davis*, 133 Ill. App. 2d at 805 ("The prevention of this irreparable injury is the keystone to the granting of injunctive relief ***"). In effect, to hold otherwise would be to hold that despite finding that Carter has raised a fair question regarding his legal right to attend school and take a service animal with him under the service animal statute, the status quo was the school district likely infringing upon Carter's claimed legal right. A probable violation of law should never be the status quo. See *County of Du Page v. Gavrilos*, 359 Ill. App. 3d 629, 638 (2005) (" 'Where the acts sought to be enjoined, however, violate an expressed law, "the status to be preserved could never be a condition of affairs where the respondent would be permitted to continue the acts constituting that violation" ' " (quoting *San Miguel v. City of Windcrest*, 40 S.W.3d 104, 109 (Tex. App. 2000) (quoting *Houston Compressed Steel Corp. v. State*, 456 S.W.2d 768, 773 (Tex. Civ. App.

16

1970)))). "The function of a preliminary injunction is not merely to contain ongoing damage but to prevent prospective damage." *Gavrilos*, 359 Ill. App. 3d at 638.

Finally, even if the status quo is to be altered, a reversal is not required in every case. See *Kirk*, 69 Ill. 2d at 486; *O'Connor*, 121 Ill. App. 3d at 535; *Adcox*, 90 Ill. App. 3d at 611-12. " 'An application for an injunction is addressed to the conscience and sound discretion of the court, and it is not controlled by technical legal rules, and unless a reviewing court finds that the discretion has been abused, the order will not be set aside.' " *Keeshin v. Schultz*, 128 Ill. App. 2d 460, 468 (1970) (quoting *Simpkins v. Maras*, 17 Ill. App. 2d 238, 249 (1958)). We find no such abuse of discretion in this case.

### B. *Balance of Hardships*

Lastly, the school district argues that the circuit court failed to properly consider the public interest in balancing the hardships between the parties and that, as a result, the preliminary injunction should be set aside. In response, Carter cites to *Barrett v. Lawrence*, 110 Ill. App. 3d 587, 593 (1982), for the proposition that the circuit court should not have balanced the hardships between the parties because the school district has clearly violated Carter's statutory right and the school district's violation of Carter's rights was wilful. In the alternative, Carter contends that the circuit court properly balanced the hardships between the parties.

"In balancing the equities, the court must weigh the benefits of granting the injunction against the possible injury to the opposing party from the injunction." *Schweickart v. Powers*, 245 Ill. App. 3d 281, 291 (1993). This general rule, however, is not applied where the violation is wilful, where the existence of a private right and the violation thereof are clear, or where the act complained of is tortious in itself. *Barrett*, 110 Ill. App. 3d at 593. In balancing the equities, the court should also consider the effect of the injunction on the public. *Village of Bensenville v. City of Chicago*, 389 Ill. App. 3d 446, 493 (2009).

17

Here, the circuit court balanced the hardships between the parties and found that the injury Carter would suffer by being denied his right to be accompanied by Corbin outweighed any harm potentially incurred by the school district. Because we find that the circuit court did not abuse its discretion in making this finding, there is no need to address Carter's argument that the circuit court should not have balanced the hardships between the parties.

As explained above, there was ample evidence to support the circuit court's finding that Carter would suffer irreparable harm if Corbin was not allowed to accompany him at school. As to the school district's harm, Carter's case manager testified she thought having a dog at school would be disruptive. The mother of another child who was planning to attend Carter's school testified that her child suffered from a rare lung disease, that her child was highly allergic to dogs, and that the school district had promised her that her child would not be exposed to any animals at school. Because of these competing interests, the court did not make the injunction effective immediately but made it effective three weeks after its entry. It did so presumably to give the school district time to accommodate both students. There was no evidence presented that the other child would be allergic to Corbin, a hypoallergenic dog, that the school district could not accommodate both students, or that the school district or public would suffer a great hardship by having Corbin at school with Carter. Carter's mother offered to provide training to the school's staff on how to handle Corbin or stay with him if need be. Thus, the circuit court did not abuse its discretion in finding in favor of Carter in balancing the hardships.

CONCLUSION

In sum, we find that Carter has demonstrated a *prima facie* case that there is a fair question concerning the existence of his claimed right under the service animal statute. Preserving Carter's claimed legal right in status quo until a decision can be reached on the

18

merits prevents Carter from suffering irreparable harm–the purpose for issuing a preliminary injunction. For the foregoing reasons, Carter's motion to strike taken with the case is granted, and the circuit court's grant of the preliminary injunction is affirmed.

Motion granted; judgment affirmed.

GOLDENHERSH, P.J., and SPOMER, J., concur.

NO. 5-09-0447

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

<table>
<tr><td>CARTER KALBFLEISCH, by and Through His Next Friends, CHRISTOPHER KALBFLEISCH and MELISSA KALBFLEISCH,</td><td>)<br>)<br>)<br>)</td><td>Appeal from the<br>Circuit Court of<br>Monroe County.</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>No. 09-CH-57</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>COLUMBIA COMMUNITY UNIT SCHOOL DISTRICT UNIT NO. 4,</td><td>)<br>)</td><td><br>Honorable</td></tr>
<tr><td></td><td>)</td><td>Dennis B. Doyle,</td></tr>
<tr><td>Defendant-Appellant.</td><td>)</td><td>Judge, presiding.</td></tr>
</table>

**Opinion Filed**:  December 16, 2009

**Justices**:  Honorable James M. Wexstten, J.

Honorable Richard P. Goldenhersh, P.J., and
Honorable Stephen L. Spomer, J.,
Concur

**Attorneys for Appellant**  Christi L. Flaherty, David L. Mannix, Guin, Martin & Mundorf, LLC, 310 Regency Centre, Collinsville, IL 62234

**Attorneys for Appellee**  Anthony P. Gilbreth, Clay B. St. Clair, Crowder & Scoggins, Ltd., 121 West Legion Avenue, P.O. Box 167, Columbia, IL 62236

Lisa Madigan, Attorney General of Illinois, Michael A. Scodro, Solicitor General, Jane Elinor Notz, Deputy Solicitor General, Erin Ipjian, Benjamin Johnson, Assistant Attorneys General, 100 West Randolph Street, 12th Floor, Chicago, IL 60601 (*Amicus Curiae* Brief - for The People of the State of Illinois)