2021 IL App (2d) 210027-U
No. 2-21-0027
Order filed March 29, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| COUNTY OF MCHENRY, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-CH-666 |
| | ) | |
| DANIEL V. WATERS, as Administrator of the | ) | |
| Estate of John Waters, PAUL IVERSON, | ) | |
| Paul Iverson a/t/u/a dated April 3, 2006 and k/a | ) | |
| Trust No. 4307, GERALD P. LENZEN as | ) | |
| Administrator of the Estate of Walter T. | ) | |
| Iverson, ORGANIC FARMS OF CRYSTAL | ) | |
| LAKE, INC., CRYSTAL LAKE BUILDERS, | ) | |
| INC., THORVALDR, INC., JOSEPH A. | ) | |
| STROPE, Unknown Occupants, Unknown | ) | |
| Owners and Nonrecord Claimants, | ) | |
| | ) | |
| Defendants, | ) | Honorable |
| | ) | Kevin G. Costello, |
| (Paul Iverson, Defendant-Appellant). | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion by granting a mandatory preliminary injunction that required corrective action, because the relief was necessary to

prevent irreparable harm and was consistent with a balancing of the equities. Affirmed.

¶ 2    On October 28, 2019, plaintiff, the County of McHenry, filed a verified complaint for preliminary and permanent injunction (hereinafter "complaint for permanent injunction") against defendants, Daniel V. Waters *et al.* The County requested that corrective action be taken on the subject property to prevent harm to the public health. On October 1, 2020, after all defendants had been served and had been given an opportunity to answer, the County moved for a preliminary injunction. The County again requested that corrective action be taken on the subject property to prevent harm to the public health. One defendant responded: Paul Iverson, *pro se.* Following an evidentiary hearing, the trial court granted the County's motion for a preliminary injunction and ordered corrective action on the property to prevent harm to the public health. Iverson filed an interlocutory appeal as of right pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017), essentially arguing that the trial court abused its discretion by issuing a preliminary injunction that went beyond the preservation of the status quo while the underlying complaint for permanent injunction remained pending. We disagree that the trial court abused its discretion; therefore, we affirm.

¶ 3                              I. BACKGROUND

¶ 4    The subject property consists of a 40-acre parcel known as 4307 Walkup Road in Crystal Lake. In January 2019, the County filed numerous zoning and ordinance violation cases against the then-alleged owner, Crystal Lake Builders, Inc. Crystal Lake Builders took no corrective action. The County then learned that the property was the subject of an action to quiet title (Case No. 16-CH-200).

¶ 5                A. The County's Complaint for Permanent Injunction

¶ 6    On October 28, 2019, the County filed a complaint for permanent injunction against all parties to the action-to-quiet-title case. The County cited its authority under section 5-25013(B)(3) of the Counties Code (55 ILCS 5/5-25013(B)(3) (West 2018)), which permits it to recommend the passage of certain ordinances for the protection of the public health and the control of disease; the County Public Health Ordinance; the International Residential Code; and the Unified Development Ordinance.

¶ 7    The County alleged that, on numerous occasions between June 2018 and August 2019, its representatives inspected the property. The inspections documented the following conditions: a substantial accumulation of rubbish and litter, including burned materials and abandoned appliances, vehicles, and batteries; empty containers allowing for the harborage and breeding of disease-vector mosquitos; existing structures with openings allowing for the entry of insects, rodents, and other vermin; a non-permitted water well connected to residential structures; an improperly abandoned water well; non-permitted modifications to a septic system; non-permitted, improperly occupied, and hazardous mobile home structures; and non-permitted and improperly placed electrical feeds serving multiple structures on the property, including the non-permitted mobile structures.

¶ 8    The County listed the corresponding ordinance and code violations. It also attached affidavits from its inspectors and photographs of the condition of the property.

¶ 9    The County requested that defendants be ordered to take 12 corrective actions and that, if they did not, the County be authorized to complete the same. These corrective actions included cleaning up litter, such as batteries, that could leak into the ground water; removing containers and sealing structures to prevent the harborage of disease vectors; bringing the water and sewage

systems into compliance; removing the mobile homes; and removing illegally installed electrical service feeds.

¶ 10    On August 28, 2020, the County moved for a default judgment.  In it, the County pled that it had served all the defendants as of December 30, 2020.  Defendant Joseph A. Strope, who owned the mobile homes, entered into a partial agreement with the County and was later dismissed from the case.  However, several of the defendants never filed an appearance, and the time to do so had passed.  Iverson appeared, moving for a substitution of judge in January 2020.  The motion was granted, but several status dates were postponed due to the coronavirus pandemic shutdown.  Iverson never filed an answer, and the time to do so had passed.  As such, the County sought a default judgment.

¶ 11    On September 2, 2020, Iverson moved for leave to file an answer and affirmative defense, noting that he had a "possessory interest" in the property.  The court granted leave.  In his answer, Iverson did not deny that the property was in the condition alleged by the County.  (He checked "Do Not Know" on the *pro se* answer form.)  Instead, he argued that the County did not have jurisdiction over the property, because it was "agricultural real estate."

¶ 12    On September 9, 2020, the court also granted defendant Waters leave to answer and entered a default judgment as to the remaining defendants.  Waters' answer is not in the record, but the County represents in its sur-reply brief that it engaged in productive conversations with Waters.  Iverson was the only remaining party to resist a cleanup of the property.

¶ 13    On November 5, 2020, Iverson moved for judgment on the pleadings.  He again argued that the county did not have jurisdiction over the property, because it was agricultural real estate.

Following a multitude of pleadings not at issue here, the trial court denied Iverson's motion "for the reasons stated in open court."[1]

¶ 14                     B. The County's Motion for Preliminary Injunction

¶ 15    In the interim, on October 1, 2020, the County moved for a preliminary injunction. 735 ILCS 5/11-102 (West 2020).  It pled that its representatives, Jack Levato and Adam Wallen, inspected the property on July 29, 2020.  The inspection revealed that the violations alleged in the complaint for permanent injunction had not been abated or remediated.

¶ 16    The County argued: "A preliminary injunction is the only remedy available to [the County] that would prevent defendants from continuing to cause the harm described above before a decision on the merits of the [complaint for permanent injunction] can be made."  It requested that the court enjoin defendants from continuing to violate the ordinances.

¶ 17    On October 27, 2020, Iverson responded to the motion for preliminary injunction.  He did not address the condition of the property.  Rather, he *again* argued that the County did not have jurisdiction over the property, because it was agricultural real estate.

¶ 18    The trial court set the matter for hearing on December 29, 2020.  It further ordered that, if Iverson should wish to depose Levato and Wallen, he should do so by December 17, 2020.  From the record before us, it does not appear that Iverson did so.

¶ 19                     C. December 29, 2020, Hearing

¶ 20    On December 29, 2020, the trial court conducted the hearing on the County's motion for preliminary injunction.  Levato, Wallen, and Iverson testified.

¶ 21                     1. Jack Levato

---

[1] The transcripts are not in the record.

¶ 22    Levato testified that he was a field staff supervisor within the environmental division of the County's Department of Health. He has been inspecting the property since 2018. In June 2018, he observed a person living in the single-family residence. That person, not Iverson, informed him that there was no running water in the residence. In December 2018, Levato observed that unpermitted well water and septic systems had been hooked up to two mobile homes on the property. The mobile homes did not have permits. Later, in July 2019, Levato observed signs of mice inside the mobile homes. One of the mobile homes was occupied by defendant Strope and his family, which included children. Further, Levato observed litter, old appliances, and signs of illegal burns at the property. Levato believed that these conditions were a threat to the public health. Specifically, the rodents posed a risk of spreading communicable disease, the burns threatened the neighbor's air quality, and the unpermitted wells and septic provided a direct conduit for contaminants to enter the County's water aquifer, which members of the public access for drinking water. Additionally, the large amounts of garbage, abandoned appliances, and batteries on the property could, eventually, degrade and contaminate the groundwater. Iverson was present during the inspection, and, in Levato's view, he did not demonstrate a willingness to abate the complained-of conditions. Further, Levato did not see any sign that the property was used for agricultural purposes. There were some chickens roaming the 40-acre property, but Levato estimated their count at fewer than 10.

¶ 23    Levato did not believe that money damages would be an adequate remedy for the County, should the County be denied a preliminary injunction but ultimately prevail at a trial on the merits of the complaint for permanent injunction. No amount of money could undo the harm done to the public health in the interim.

¶ 24                                    2. Adam Wallen

¶ 25    Wallen testified that he was a building enforcement officer with the County's Department of Planning and Development. He is familiar with the International Residential Code and Unified Development Ordinance. He first inspected the property in August 2019. The first mobile home had many violations. A tree had fallen on it, and portions of the structure were missing. The walls and roof were open to the elements. A step ladder was serving as an access point. The electrical services were crudely implemented. Multiple splices in the electrical service ran throughout the property, over driveways and through puddles. Some of the splices were "live."

¶ 26    The second mobile home's point of entry was an unstable, retrofitted plywood deck. The deck was covered in "a lot" of animal waste, making it difficult to enter the home. There were multiple intrusion points for water. Wallen did not notice "much in the way of plumbing." Additionally, the electrical services within the home contained "blocked" receptacles and electrical items, such as fans, that were improperly hung on bed mattresses. When Wallen returned to the property in August 2020, the mobile home was in roughly the same condition. However, the deck had been removed, creating an improper access point three feet off the ground. It did not appear that anyone was living in the mobile home at that point. Instead, there were a few chickens in it.

¶ 27    Similarly, the single-family residence was uninhabitable. It did not have operable plumbing services. Even upon the second visit, it had not been boarded up to prevent illegal entry or occupation by wildlife.

¶ 28    Wallen addressed Iverson's claim that the property was exempt from compliance because it was agricultural real estate. Just because a property is zoned agricultural does not mean that it is being used for agricultural purposes. It is true that buildings being used for agricultural purposes are not subject to residential building codes. However, for a building to qualify for an agricultural exemption, the owner must apply for a permit. As part of the permitting process, the owner must

provide a site plan showing the building in question and explaining the proposed agricultural use. Neither Iverson nor any other person has applied for said permit.

¶ 29    On cross-examination, Wallen agreed that, on his second visit, "the electrical for the [mobile home] was removed." Also, the non-compliant deck had been removed.

¶ 30                                3. Paul Iverson

¶ 31    Iverson testified that, although he did not live on the property or own the property, he had a "future interest" in it through a "Mr. [Michael] Bercos." He referred to the pending claim to quiet title on the property, and he explained that he and his "cousin's kid are going to end up with [the property]." He did not present documentary evidence to support his claims.

¶ 32    Iverson had been visiting the property since he was a child. In his view, the wells and septic "work" as they have always worked. "You can flush [the toilet] with a bucket of water." Iverson "did not see a problem" with hooking up the mobile homes to the septic system sans permit. He explained that the mobile homes were no longer being used as residences, so he did not need a permit. The mobile homes did not belong to Iverson. Rather, Strope brought the mobile homes onto the property. Strope no longer lives there. He left the mobile homes behind.

¶ 33    Further, Iverson testified that he has improved the property. As mentioned, he disconnected the electrical service to the mobile homes and removed the deck. He put a lid over one of the wells. He admitted that there were approximately 10 appliances on the property, but he plans to use them for scrap. In fact, he believes that much of what the County has deemed litter is salvageable. He has plans to turn the property into a working farm. He would like to sell chickens and hay. He would not use the mobile homes as residences but for storing hay. Also, another man maintains beehives on the property. Iverson did not know the man's name; he is "some guy."

¶ 34                    4. Closing Argument and the Trial Court's Oral Ruling

¶ 35    In closing, as is relevant to the instant appeal, the County argued that it had shown a "likelihood of success on the merits," because it had shown that there is a "likelihood that the ordinances are being violated." In addition, the County urged that any hardship to Iverson, who "just wants everyone to leave him alone," "paled in comparison to the hardship that could occur to the County [if the water aquifers became contaminated.]"

¶ 36    It requested the following relief: "We would ask the court to grant our *preliminary injunction* so that we can put the property back into compliance with our ordinances, [remove] the trailers, remove the debris and litter *** , confirm the water wells are properly abandoned, and *everything that is listed in our complaint for injunctive relief*." (Emphases added.)

¶ 37    Iverson reiterated his argument that the County did not have jurisdiction to regulate the property, because it was agricultural real estate. Iverson did not take issue with the County's request for comprehensive corrective action, should the County prevail at this preliminary stage. The trial court asked Iverson how he would be damaged if the County cleaned up the property. Iverson stated that he wanted to use some of the items that the County considered garbage. Also, he did not want a lien on the property.

¶ 38    The trial court granted the County's motion for preliminary injunction. It prefaced its ruling by stating that it had not seen "any evidence" to suggest that Iverson had a current ownership interest in the property. However, "in an abundance of caution," it would consider Iverson's argument to the extent it was relevant to whether a preliminary injunction was warranted. The court believed that the County had authority to regulate the property to protect the public health, and it did not believe an agricultural exemption applied.

¶ 39    The trial court next addressed the four traditional elements necessary to obtain a preliminary injunction, essentially adopting the County's arguments. As to the fourth element, the

court stated: "A likelihood of success. Again, they have established in the court's view that those ordinances apply and that there [was] certainly *prima facie* evidence of violation of those ordinances." Additionally, the court determined that the equities weighed in favor of the County. It stated: "And lastly, a balancing of the equities. Here, again, the County has established clearly that there are public health issues that need to be *** remedied. On the reverse of that, the court struggles to see what harm there is to Mr. Iverson." The court reasoned that, if the County performed the cleanup, the County would place a lien on the property. Thus, "for Mr. Iverson to be legally responsible ***, it would have to be established that he has an ownership interest in the property. If he simply— And I don't use this term to offend anyone, [is] an interloper, then *** the County would have no basis to get monetary damages from him." The court further noted that Iverson testified that many of the items, such as the mobile homes, were *not* his. Nevertheless, the court would give Iverson 30 days to remove any items that were "near and dear" to him prior to the cleanup.

¶ 40    The court concluded: "So, given all of those considerations, the court finds that the [C]ounty has met its burden of proof and will issue a preliminary injunction in favor of the [C]ounty." The court requested that the County prepare the written order and submit it electronically through the court's proposed order system.

¶ 41                                  5. Written Order

¶ 42    On December 31, 2020, the trial court issued its written order. In paragraph one, the court held, *inter alia*, that the County had a "substantial likelihood of success on the merits." In paragraph two, the court held that the property "is found" to be in violation of the ordinances. The

court ordered defendants to take 11 corrective actions within 30 days.[2] If defendants did not take the 11 corrective actions, the County could perform them, the cost of which would result in a lien recorded against the property. The court set the case for status on February 2, 2021, to monitor the progress of the remediation. Iverson appeals pursuant to Rule 307(a)(1). Ill. S. Ct. R. 307(a)(1).

¶ 43                                    II. ANALYSIS

¶ 44     Iverson argues that the trial court abused its discretion by issuing a mandatory preliminary injunction that went beyond the preservation of the status quo while the underlying complaint for permanent injunction remained pending. The issuance of a preliminary injunction is not controlled by technical legal rules but, rather, rests within the conscience and sound discretion of the trial court. *Kalbfleish v. Columbia Unit School District No. 4*, 396 Ill. App. 3d 1105, 1119 (2009). The trial court's issuance of a preliminary injunction will not be reversed absent an abuse of discretion. *Id*. An abuse of discretion occurs only when the trial court's order is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the court's view. *Enbridge Pipelines (Illinois), LLC v. Troyer*, 2015 IL App (4th) 150334, ¶ 14.

¶ 45     Generally, the party seeking a preliminary injunction must establish facts demonstrating that: (1) it has a protected right; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) its remedy at law is inadequate; and (4) there is a likelihood of success on the merits. *County*

---

[2] The 11 corrective actions are substantially similar to the 12 corrective actions prayed for in the underlying complaint for permanent injunction. The missing action is "clean and sanitize all areas within the remaining single family residential structure that was impacted by garbage, rubbish, waste, and animal waste."

*of Du Page v. Gavrilos*, 359 Ill. App. 3d 629, 634 (2005). However, when a statute expressly authorizes injunctive relief to enforce its provisions, the second and third elements, irreparable harm and inadequate remedy at law, need not be shown. *People v. Fiorini*, 143 Ill. 2d 318, 346 (1991). Such is the case when a government seeks to enforce its ordinances. *Gavrilos*, 359 Ill. App. 3d at 634. A governmental agency seeking a preliminary injunction to enforce its ordinances need only show that the ordinance at issue allows for injunctive relief and there is a likelihood that the ordinance is being violated. *Id*. Under either the traditional, four-element test or the more streamlined test available to governmental agencies, the trial court must also balance the equities to determine the relative inconvenience to the parties and whether the burden upon the defendant, should the injunction issue, outweighs the burden to the plaintiff by denying it. *Shodeen v. Chicago Title and Trust Co.*, 162 Ill. App. 3d 667, 673 (1987) (four-element test); *County of Kendall v. Rosenwinkle*, 353 Ill. App. 3d 529, 539 (2004) (streamlined test).

¶ 46    The purpose of a preliminary injunction is to preserve the status quo until the case can be decided on the merits. *Rosinia v. Gosmano*, 90 Ill. App. 3d 882, 886 (1980). Mandatory preliminary injunctions that require the defendant to take corrective action are more likely than prohibitive preliminary injunctions to stray beyond the preservation of the status quo and are, therefore, subject to scrutiny. *Shodeen*, 162 Ill. App. 3d at 673. To obtain such relief, the plaintiff must show that the corrective action is in fact necessary to preserve the status quo. *Id*.

¶ 47    The status quo is defined as the last actual, peaceable, uncontested status which preceded the pending controversy. *Gavrilos*, 359 Ill. App. 3d at 638. "Between a zoning jurisdiction and a property owner or tenant, the last peaceable state of existence between those parties is a *state without a zoning violation*." *Id*. (Emphasis added). A continuing violation of the law cannot be

the status quo. *Id*. Further, in aiming to preserve the status quo, the court should be mindful to craft an order that not only contains ongoing damage but also prevents prospective damage. *Id*.

¶ 48    As this court recognized in *Gavrilos*, there is scant case law addressing the preservation of the status quo in the context of alleged zoning or ordinance violations. *Id*. In *Gavrilos*, which involved the issuance of a temporary restraining order on an adult business operating in violation of applicable zoning ordinances, we turned to rulings from other jurisdictions. *Id*. Several of these rulings show how, to preserve the status quo in the context of an alleged zoning or ordinance violation, the court may order mandatory, as opposed to prohibitive, relief that requires the defendant to take corrective action. See *City of Stamford v. Kovac*, 634 A.2d 897, 898-900 (Conn.1993) (following a hearing on a motion for a preliminary injunction, property owners who diverted the natural flow of a waterway could be compelled to undertake restorative acts, including removing fill to regrade the property and replanting native plants, within 45 days, at which time plaintiff would be authorized to perform the work and record a lien against the property); see also *Burton v. Celentano*, 658 P.2d 247, 597 (Ariz.1982) (trial court acted within its discretion to issue a mandatory preliminary injunction requiring the removal of a wooden wall that allegedly diverted the natural flow of a local waterway in violation of applicable floodplain laws).

¶ 49    Moreover, even apart from ordinance or zoning violation cases, there are instances where a court's assessment of the equities warrants action rather than inaction to preserve the status quo. Consider, for example, *Kalbfleisch*, where the parents of a five-year-old autistic boy moved for a preliminary injunction to permit their son to bring his service dog to school pursuant to a service animal statute. *Kalbfleisch*, 396 Ill. App. 3d 1105. The trial court determined that the parents met the four elements necessary to obtain a preliminary injunction. *Id*. at 1114-15. It also balanced the hardships between the parties and found that the injury the boy would suffer by being denied

his (likely) statutory right to be accompanied by his service dog outweighed any harm potentially incurred by the school district by having to rearrange class assignments for one student who was allergic to dogs. *Id*. at 1120. The court ordered that the boy be allowed to bring his service dog to school, giving the school district three weeks to prepare for the dog's arrival. *Id*.

¶ 50     On appeal, the school district argued, *inter alia*, that the order was improper, because it altered the status quo. In its view, allowing the boy to attend school with his service dog could not be the status quo, because it was never the actual status. The appellate court disagreed, explaining:

> "[S]ometimes it happens that the status quo is not a condition of rest but, rather, is one of action and the condition of rest is exactly what will inflict the irreparable harm. *** To hold that the status quo was [the boy] not attending school with his service dog because the service dog never attended school last year would leave [the boy] with no avenue to prevent suffering irreparable harm—the purpose behind issuing a preliminary injunction in the first place. *** [E]ven if the status quo is to be altered, a reversal is not required in every case. [Citation.] An application for an injunction is addressed to the conscience and sound discretion of the court, and it is not controlled by technical legal rules, and unless a reviewing court finds that the discretion has been abused, the order will not be set aside." (Internal quotations omitted.) *Id*. at 1118-19.

The appellate court concluded that no abuse of discretion had occurred, and, to the contrary, the trial court had appropriately balanced the hardships between the parties. *Id*. at 1120.

¶ 51     Here, as in *Stamford*, *Burton*, and *Kalbfleisch*, mandating corrective action was necessary to maintain the status quo. The corrective actions were necessary both to contain ongoing damage and to prevent prospective damage that would occur during the pendency of the suit. For example, Levato and Wallen each testified that the condition of the property posed a threat to public health

and safety. Numerous conditions on the property posed a risk to the ground water and the public drinking supply. Other conditions on the property harbored wildlife, such as mosquitos and mice, and, thus, were vectors for disease in the community. Levato further testified that, should the County be denied a preliminary injunction but ultimately prevail at a trial on the merits, monetary damages would be inadequate to remedy the harm to the public health that would have occurred during the pendency of the suit.

¶ 52    Moreover, each of the corrective measures at issue are aimed at curing an immediate threat to the public health. Again, these corrective measures include cleaning up litter, including batteries that could leak into the ground water; removing containers and sealing structures to prevent the harborage of disease vectors; bringing the water and sewage systems into compliance; and removing illegally installed electrical service feeds. Arguably, the order to remove, as opposed to repair, the mobile homes altered the status quo in a strict sense. However, the mobile homes were owned by Strope, who has already entered into an agreement with the County. In any case, we note that Iverson has never attempted to parse the requested action items according to their respective threat to the public health. Therefore, a slight alteration from status quo here may be excused in deference to trial court's consideration of the equities. See *Kalbfleisch*, 396 Ill. App. 3d at 1119-20.

¶ 53    The trial court is afforded broad discretion in issuing preliminary injunctions, and, here, the court performed a thoughtful analysis. The court would have been justified in performing the streamlined test applicable when governmental agencies seek to enforce an ordinance, but the court went beyond that and considered each of the traditional elements necessary to obtain a preliminary injunction. In addition, the court balanced the equities. It reasonably determined that the hardship to be borne by the County absent immediate corrective measures far exceeded the hardship to be

borne by Iverson were the court to order the same but later determine at a final hearing on the merits that the ordinances had not in fact been violated. As discussed, monetary damages would be inadequate to compensate the County were the court to deny the corrective measures. However, monetary damages would be sufficient to compensate Iverson in the unlikely event that the court ultimately determined the cleanup had not been warranted. This, of course, is assuming Iverson was able to establish an ownership interest in the property. Even in the short-term, Iverson would not be responsible for a lien recorded against the property absent an ownership interest. Also, Iverson testified that some of the items that the County considered litter were salvageable, but Iverson was given 30 days to remove these items from the property. We defer to the trial court's assessment of the equities.

¶ 54    We reject Iverson's argument that the County cannot have demonstrated an *immediate* need for corrective action, because eleven months passed between the filing of the complaint for permanent injunction and the motion for preliminary injunction. Iverson himself represents that, during this time, the County: (1) awaited appearances from all defendants; (2) awaited a late answer from Iverson; and (3) pursued other avenues by which to obtain immediate relief, such as a default judgment. Further, the record shows that Iverson moved for a substitution of judge and that subsequent status hearings were delayed due to the coronavirus pandemic shutdown. The County can account for the passage of time, and the passage of time does not cause us to question the trial court's determination that immediate corrective action was necessary.

¶ 55    Finally, to the extent Iverson argues that the December 29, 2020, hearing amounted to an unnoticed hearing for a permanent injunction, and the December 31, 2020, order amounted to a final determination on the merits of the underlying complaint for permanent injunction, we

disagree.[3] While the trial court is afforded broad discretion in granting preliminary injunctions and in fashioning the appropriate relief, one thing it cannot do at the preliminary stage is render a final determination on the merits and, in so doing, effectively grant a permanent injunction. See *Electronic Design and Manufacturing, Inc. v. Konopka*, 272 Ill. App. 3d 410, 415 (1995).

¶ 56    A preliminary-injunction hearing, unlike a trial on the merits, generally consists of an abbreviated evidentiary hearing on an emergency basis. *Id.* "The 'findings' of a court under these circumstances do not carry with them the preclusive effect of *res judicata*. The parties, therefore, are not foreclosed from offering additional evidence at the final trial in the case. In addition, the relief available under a preliminary injunction is provisional in nature." *Id.*

¶ 57    Due process concerns are implicated when, at the conclusion of a preliminary-injunction hearing, the trial court effectively grants a permanent injunction. *Id.* It is axiomatic that, before commencement of the hearing, the parties are put on notice that the hearing is, in effect, a trial on the merits. *Id.* This is true even when there is no indication that the responding party would have produced further evidence had it been notified that the entire case would be disposed of in a single hearing. *Id.*

¶ 58    Here, in its written order drafted by the County, the trial court "found" the property to be in violation of the various ordinances. Standing alone, this language might suggest a final determination on the merits of the complaint for permanent injunction. However, in the same order, the trial court also wrote that the County had a "substantial likelihood of success on the

_____

[3] Iverson argues: "At the preliminary injunction stage of this case, it was error for the trial court to conduct a hearing on controverted facts, make findings on those facts, and then issue a mandatory preliminary injunction [granting the ultimate relief sought]."

merits" of its complaint for permanent injunction. Additionally, the trial court referenced the "likelihood of success" element many times throughout the hearing and made a finding of the same in its oral ruling. As such, a review of the entire record establishes that the trial court understood that its "finding" of ordinance violations was provisional in nature, did not carry the preclusive effect of *res judicata*, and did not foreclose Iverson from offering additional evidence at the final trial on the merits. See *id*.

¶ 59 We observe some irony in Iverson's argument that he was wronged because the trial court conducted an evidentiary hearing before issuing mandatory corrective actions. Rather than signify an unnoticed trial on the merits, the due process afforded to Iverson served to protect his rights at a preliminary stage of the case. Indeed, Iverson fully participated in the proceedings below. For example, he was given the opportunity to file a late answer to the underlying complaint. He was given a hearing on his motion for judgment on the pleadings. He was given the opportunity to depose Levato and Wallen. Most importantly, he participated in an evidentiary hearing on the County's motion for preliminary injunction.

¶ 60 We do note, however, that there are gaps in the record, some of which have been filled in piecemeal fashion. For example, Iverson has come to us at the eleventh hour to inform us of the County's motion for default judgment and the timing of Iverson's answer. Defendant Waters' motion for leave to file an answer is not in the record. Also, the transcripts from the hearing on Iverson's motion for judgment on the pleadings are not in the record. "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). On the record before us, we determine that Iverson received adequate due process.

¶ 61    In sum, the circumstances in this case justify the trial court's issuance of a mandatory preliminary injunction requiring corrective action. Immediate action was necessary to prevent harm to the public health that would occur during the pendency of the case. Iverson received adequate due process, yet he was unable to convince the court that he would suffer any hardship due to a cleanup of the property pending a final determination on the merits of the case. The trial court did not abuse its discretion.

¶ 62                                    III. CONCLUSION

¶ 63    For the reasons stated, we affirm the trial court's judgment.

¶ 64    Affirmed.