No. 2—10—1088
Opinion filed March 1, 2011

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DEBORAH SEYLLER, as Kane County Clerk of the Circuit Court, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff and Counterdefendant-Appellant, | ) ) ) ) | |
| v. | ) ) | No. 10—MR—443 |
| THE COUNTY OF KANE; THE KANE COUNTY BOARD; KAREN McCONNAUGHAY, as County Board Chairman; DEBORAH ALLAN, CRISTINA CASTRO, DONNELL COLLINS, MARK DAVOUST, JOHN P. FAHY, RON FORD, DREW FRASZ, JOHN J. HOSCHEIT, CATHERINE S. HURLBUT, GERALD A. JONES, MICHAEL KENYON, ROBERT A. KUDLICKI, BONNIE LEE KUNKEL, JENNIFER LAESCH, SYLVIA LEONBERGER, PHILIP LEWIS, HOLLIE LINDGREN, JOHN B. MAYER, ROBERT J. McCONNAUGHAY, JEANETTE MIHALEC, JAMES C. MITCHELL, JR., JACKIE TREDUP, THOMAS VAN CLEAVE, JESSE VAZQUEZ, BARBARA WOJNICKI, and WILLIAM A. WYATT, as County Board Members, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants and Counterplaintiffs-Appellees. | ) ) ) | Honorable Stephen Sullivan, Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices McLaren and Hutchinson concurred in the judgment and opinion.

**OPINION**

Plaintiff, Deborah Seyller, as the elected Kane County clerk of the circuit court (Clerk), appeals from an order of the circuit court of Kane County granting a preliminary injunction in favor of defendants the County of Kane, the county board, and members of the county board (collectively the County) and denying her motion for a preliminary injunction. We affirm.

BACKGROUND

The instant controversy is about whether the Clerk may use monies in "special funds"[1] to pay personnel costs, or whether personnel costs are to be funded by monies appropriated from the County's General Revenue Fund. The legislature provided for the creation of the special funds, to be retained by the county treasurer and generated from fees collected by the circuit clerk for

---

[1]The Clerk's complaint refers to a "general fund" and to "special" or "restricted funds" without naming them. The County's counterclaim refers to the County's General Revenue Fund, the Court Automation Fund, the Court Document Storage Fund, the Child Support Fund, and the Court "Operative" and Administrative Fund. The trial court directed the Clerk to pay personnel costs from the Court Automation Fund, the Court Document Storage Fund, and the "Administrative Services" Fund. The crux of this appeal involves an analysis of the Court Automation Fund and the Court Document Storage Fund, which for ease of reference we call the "special funds." We adopt the County's nomenclature for general funds as the "General Revenue Fund." Different witnesses referred to the "Court Operation and Administrative Fund" (see 705 ILCS 105/27.3d (West 2008)) simply as the Administrative Fund. For consistency, we use "Court Operation and Administrative Fund" where applicable.

automated recordkeeping (705 ILCS 105/27.3a (West 2008)) and document storage (705 ILCS 105/27.3c (West 2008)).

The dispute centers on the Clerk's request that the County appropriate monies from its General Revenue Fund, above what it approved for the Clerk's 2010 budget, in order to meet the mandated obligations of the office of the Clerk. The Clerk defines her mandated obligations as those imposed by state statutes, applicable state and federal regulations, rules of the Illinois Supreme Court, orders of the chief judge of the Sixteenth Judicial Circuit, and orders of other judges. Without such additional funding, the Clerk cautioned, she would be forced to close her office and the courts, as she had exhausted before the end of the fiscal year the monies appropriated to her from the County's General Revenue Fund. The County passed a resolution denying the Clerk's request. The resolution cited the Clerk's action in hiring without the County's consent additional employees whose salaries and benefits were not included in her budget.

On September 14, 2010, the Clerk filed a verified complaint for declaratory judgment and other relief against the County. In that complaint, the Clerk claimed that the County did not appropriate sufficient monies from the General Revenue Fund for her office for the fiscal year 2010 and that, if she did not receive additional monies from the General Revenue Fund, she would be unable to make her payroll for the remainder of the fiscal year and would have to close her office and the courts.

Specifically, the Clerk alleged that, although she had submitted a proposed budget of $4,782,665 for the fiscal year 2010, the County appropriated only $4,147,968. The Clerk requested (1) a declaration that the County is required to fund the reasonable and necessary expenses of the Clerk's office; (2) a writ of *mandamus* requiring the County to fund those expenses; (3) a declaration

that the Clerk is not required to submit line-item budgets for review by the County; (4) an order stating that the Clerk's office is to remain open and staffed and directing the County to fund the requisite expenses; and (5) an injunction requiring the County to approve the funding requested in her supplemental budget request.

The Clerk subsequently filed a motion for a preliminary injunction to compel the County to add funds, beyond those appropriated to her budget from the General Revenue Fund, for the fiscal year 2010, so that her office could continue to operate as usual. Attached to that motion was an affidavit from the Clerk. In that affidavit, the Clerk explained the following. Although case filings had declined between 2006 and 2009, the chancery cases, which were "vastly more time intensive to manage," increased by 3,245 cases. In that same period, the judiciary added new judges and new courtrooms, which required at least one additional clerk to be assigned while court was in session. Between 2007 and 2010, the average number of documents processed monthly by the Clerk's office increased from 91,905 to 121,821. Furthermore, despite the increased workload, the staff had decreased over time, from 99 in 2008 to 96.5 in 2010 and 95.5 when the motion for a preliminary injunction was filed. The County's 2010 budget reduced appropriations for the Clerk's office by $116,549 from the 2009 fiscal year and $474,483 from the 2008 fiscal year.

On September 28, 2010, the County filed a verified answer and a counterclaim. As a threshold matter, the counterclaim explained how the Clerk's office was funded. The County appropriated funds for the Clerk's annual budget from the County's General Revenue Fund. The County appropriated further funds for the Clerk's office from the special funds as well as the Child Support Fund and the Court Operation and Administrative Fund (other named funds), which are funded by the litigation fees the Clerk charges. The County alleged that it determined that the Clerk's

2010 budget needs from the General Revenue fund should not exceed the 2009 level because of the decrease in court filings and the improved efficiency of running the Clerk's office, but that the Clerk's allocation from the other named funds, including the special funds, should be increased. The County alleged that the Clerk hired additional personnel and charged their compensation to the General Revenue Fund appropriations for the Clerk's 2010 budget, thus exhausting those monies without using the other named funds available to her.

The counterclaim sought to: (1) prohibit the Clerk from spending funds in excess of her budget; (2) compel the Clerk to use monies appropriated from the special funds to meet payroll for the remainder of fiscal year 2010; or (3) compel the Clerk to seek her remedy under sections 15 and 22 of the Clerks of Courts Act (705 ILCS 105/15, 22 (West 2008)), by which a majority of the judges of a court may determine and fix the number of deputy clerks necessary to perform the requisite functions and order those deputy clerks to be employed and compensated. Finally, the counterclaim alleged a constitutional-tort claim, seeking to hold the Clerk personally liable for intentionally and knowingly overspending the budget appropriated for her office.

The County also filed its own motion for a preliminary injunction. The County explained that there were monies from both the General Revenue Fund and the special funds appropriated for the Clerk's office and that her 2010 budget exceeded her actual expenditures for the previous fiscal year by more than $1 million. The County argued that the special funds had excess monies available and that those funds could lawfully be used to pay personnel costs. The County requested that the Clerk be ordered to use the special funds as well as the Court Operation and Administrative Fund to meet her payroll expenses for the remainder of fiscal year 2010.

On October 15, 2010, a hearing was held on the preliminary injunction.[2] In opening, the Clerk argued that the County had an obligation to fund the reasonable and necessary expenses of the Clerk's office. She also argued that everyone agreed that shutting down the Clerk's office mid-month due to budgetary shortfalls was not an option. The Clerk argued that the issue was whether the status quo should be maintained by the County continuing to fund her office from the General Revenue Fund or whether she should be required to expend monies from the special funds. The Clerk argued that there are restrictions on the use of the special funds and that she was already expending those funds to the maximum extent possible. She further argued that there would be no harm from the County funding her office with monies from the General Revenue Fund because, if the trial court later found in favor of the County, it would merely be an accounting function to transfer monies from the special funds back to the General Revenue Fund.

The Clerk argued that she had provided verified pleadings and two affidavits explaining how she had allocated expenses to the special funds. Furthermore, she argued, the County stated in its verified answer that it had no knowledge of how the Clerk's office functions. Accordingly, the Clerk argued that it was disingenuous for the County to require her to expend the special funds when it could not dispute her evidence. The Clerk argued that the County wanted her to charge 30% of her personnel budget against the special funds, but she contended that she was already doing that. The Clerk argued that there would be irreparable harm if the trial court required her to expend the special funds but later found, in her favor, that the personnel costs at issue could not be lawfully paid from

_____

[2]Although there were two opposing motions for preliminary injunctions before the trial court, the Clerk did not introduce any evidence (other than her affidavits) in support of her motion. Upon the parties' agreement, the court consolidated both motions for the hearing.

those funds. She reasoned that she would have been compelled to violate the special fund statutes and engage in official misconduct. The Clerk requested an injunction to bar the County from refusing to appropriate from the General Revenue Fund additional monies that would allow her to operate her office at its present level.

The County argued that the appropriations ordinance encompassing the Clerk's 2010 budget was entitled to a presumption of validity. The County stated that when the budget was created the number of case filings appeared to be trending down. Even though the Clerk did not get the amount requested from the General Revenue Fund, her total budget was $1 million more than she had actually spent the year before. The County argued that the special funds could be used to pay personnel costs and that the County was responsible for authorizing the expenditures from those funds. The County argued that the Clerk never provided details as to why her appropriated budget was insufficient. The County requested that the Clerk be compelled to use the special funds to meet the obligations that could not be met by the monies appropriated from the General Revenue Fund. The County stated that the Clerk needed $520,000 to get through November 30, 2010, the end of the fiscal year. The County argued that the Clerk could not be held liable for unlawfully spending monies in the special funds, because the statutes permitting the creation of those funds specifically provided that the County shall direct how those funds are spent, and the County was doing that.

At the hearing, the County called the Clerk as an adverse witness. The Clerk testified that, when she submitted her proposed budget to the County, she included materials showing that her office was barely performing its mandates. She stated that when the budget was presented, filings in the Clerk's office were up by 17%, not down. She showed the additional funds that would be needed to hire more deputy clerks.

The Clerk acknowledged that her deputy clerks access computers to assist litigants and the courts, and that they enter orders and filings into computers every day. They also scan documents and enter other information into the document storage system every day. She testified that she had replaced "the typewriter with a keyboard," meaning that the entire recordkeeping enterprise of the Clerk's office was electronic. It consisted of the document storage system and the automated (recordkeeping) system. She spoke of both collectively as one "system." The Clerk testified that it was her understanding that she was legally restricted to using the special funds to "establish and maintain" the "system," not to compensate personnel for data entry into the "system."

The Clerk further testified that her deputy clerks perform other tasks besides data entry, such as receiving paper, placing it in prongs, file-stamping, and shelving. She testified that she performed time studies to determine how much of the personnel costs to attribute to either the General Revenue Fund or the special funds. She essentially timed what the deputy clerks were doing and allocated costs according to how long it took to complete various tasks. In determining which category of appropriations should fund particular tasks, she relied on the statutes and spoke with the State's Attorney.

According to the Clerk, following the budget process, she submitted to the County a resolution requesting additional monies to fund her office and its personnel. The Clerk testified that she did not really receive a $1 million increase in her budget, because there were monies left over in the special funds from the 2009 fiscal year that carried over to her 2010 budget. For that reason, she testified, the monies appropriated to the special funds for the 2010 fiscal year were about the same as for the previous year.

The Clerk acknowledged that she had not received from any agencies any notices that she was not fulfilling her mandates. She explained that this was because she had hired additional staff necessary to perform the mandates. The Clerk noted that, before she hired additional staff, her office was seven weeks behind in processing "SDU" payments; her office was not timely refunding bond, restitution, or child support money that had been unclaimed (she had received complaints); and her office was not reporting DUI dispositions in a timely fashion. According to the Clerk, she shared this information with the County as part of her resolution.

She testified that, in response to her requests for additional funding, the County told her to cut her budget. The County did not tell her to rely on monies in the special funds. In fact, according to the Clerk, the County had directed the State's Attorney's office to investigate whether she was overspending from the appropriations to the special funds. She said that her allocations were in accordance with guidance she received from the State's Attorney. The Clerk acknowledged that the State's Attorney's investigation was in response to a comment she had made before the county board that she was misspending the monies in the special funds. She said that she essentially allocated 32% of her personnel costs to the special funds and 68% to the General Revenue Fund. At the time of the hearing, she had almost completely exhausted the monies appropriated from the General Revenue Fund for the year. Finally, the Clerk testified that, if she did not receive additional monies from the General Revenue Fund, she would have to close the office.

Ken Shepro testified that he was appointed as a special assistant State's Attorney for the purpose of representing the county board and the county board chairman. He attended many budget and committee meetings related to the fiscal year 2010 budget. He testified that the Clerk presented her supplemental budget request at a May 2010 Judicial and Public Safety Committee (JPSC)

meeting. At that meeting, she submitted a one-page resolution that reflected the budget adjustment she was requesting. Shepro testified that during the fiscal year that began December 1, 2009, the Clerk did not attend any JPSC meetings until May 2010. At that May 2010 meeting, the committee members requested details, and the Clerk stated that she would provide additional information at the next meeting. She provided no information at the June meeting, but at the July meeting she presented a revised resolution requesting about $20,000 less. In the absence of additional information, the committee voted to deny the Clerk's request and it forwarded the recommendation to the finance committee. The finance and executive committees both denied the request. The county board then considered the request at its September 13, 2010, meeting, and it also denied the request.

Cheryl Pattelli testified that she was the finance director for the County. She acknowledged that the County had a contingency fund for emergency expenditures that arise during a given year. According to Pattelli, the contingency fund was a line item in the General Revenue Fund. The monies in the contingency fund were set aside to be used in case any of the County's revenues fell short of projections. At the time of the hearing, there were pending requests for $635,000 in contingency funds, in excess of the $493,000 that remained in the contingency fund. Pattelli estimated that, by the end of fiscal year 2010, the Court Automation Fund would have an unused balance of $202,000; the Court Document Storage Fund would have an excess of $561,000; and the Court Operation and Administrative Fund would have an excess of $115,000. Additionally, she testified that the special funds had substantial balances of cash on hand. According to Pattelli, the amounts allocated to those funds for the Clerk's 2010 budget were what the Clerk had requested. Pattelli testified that the Clerk's total expenditures for 2009 were $6.7 million and that her 2010 budget was $7.8 million.

Patsy Clark testified that she was the County payroll manager. Clark identified and explained

various exhibits admitted into evidence by the County. Clark testified that the exhibits showed that no deputy clerks were paid out of the Court Automation Fund, seven were paid out of the Court Document Storage Fund, two out of the Child Support Fund, and two out of the Court Operation and Administrative Fund. The remainder of the deputy clerks were paid out of the General Revenue Fund. Clark testified that the Clerk is the one who designates which employees will be paid out of either the appropriation from the General Revenue Fund or the other funds. The employees in the Clerk's office earn salaries and benefits. The exhibits showed that an average salary for a deputy clerk was $34,306, and an annual benefits cost was $9,860.

After considering the pleadings, affidavits, arguments of counsel, exhibits, and testimony, the trial court ruled in favor of the County. The trial court noted that allowing the Clerk's office to close for lack of funding was not an option. After enumerating the factors that it must consider in granting injunctive relief, the trial court stated that it had given extra consideration to balancing the harm. The trial court found that the County went through a thoughtful and deliberate process in establishing a budget for the Clerk's office, and it said that the County has the "power of the purse." The trial court also remarked that the Clerk's 2010 budget was more than $1 million greater than her expenditures for the previous year.

Although the Clerk alleged that she could not meet her mandates, the trial court found that the record did not support that conclusion because there was no evidence that the Clerk had received any notices of failure to meet mandates. The trial court found that the statutes authorizing the establishment of the special funds permitted those funds to be used for personnel costs. Accordingly, the trial court ordered the Clerk to charge at least $520,000 to the special funds and to the Court Operation and Administrative Fund, and "to pay the compensation of deputies from those funds and,

in compliance with the statute, seek the approval of the Chief Judge if the same is required under the relevant statute." This verbal finding was memorialized in a written order on October 18, 2010.

The Clerk thereafter filed a timely notice of interlocutory appeal.

ANALYSIS

"The decision to grant or deny a preliminary injunction rests within the sound discretion of the trial court, and a reviewing court will not disturb the decision absent a clear abuse of that discretion." *Desnick v. Department of Professional Regulation*, 171 Ill. 2d 510, 516 (1996). To obtain a preliminary injunction, a plaintiff must establish that: "(1) he possesses a certain and clearly ascertained right which needs protection [citations]; (2) he will suffer irreparable injury without the protection of the injunction [citation]; (3) there is no adequate remedy at law for the injury [citation]; and (4) plaintiff is likely to be successful on the merits." *S&F Corp. v. American Express Co.*, 60 Ill. App. 3d 824, 828 (1978).

On interlocutory appeal, the only question before a reviewing court is whether there was a sufficient showing to sustain the order of the trial court granting or denying the relief sought. *Id.* The purpose of a preliminary injunction is not to decide the merits of the case but to preserve the status quo. *Madigan Brothers v. Melrose Shopping Center Co.*, 130 Ill. App. 3d 149, 151 (1984). A plaintiff is not required to present a case that will entitle him to the relief he seeks but need only raise a fair question as to the existence of the rights claimed. *Id.*

In the present case, we cannot say that the trial court abused its discretion in granting preliminary injunctive relief in favor of the County. The County established that it had a clearly ascertained right in need of protection. Section 6—1005 of the Counties Code provides:

"Except as herein provided, neither the county board nor any one on its behalf shall have power, either directly or indirectly, to *** do any act which adds to the county expenditures or liabilities in any year anything above the amount provided for in the annual budget for that fiscal year." 55 ILCS 5/6—1005 (West 2008).

While it is true that the County had the responsibility to appropriate for, and fund, the necessary and reasonable expenses of the Clerk's office, the Clerk, as the statutory language quoted above demonstrates, had the responsibility to operate her office within the County's budget constraints.

The County further established that it had no adequate remedy at law and would suffer irreparable harm in the absence of the injunction. The Clerk stated that, without additional monies appropriated from the General Revenue Fund to cover personnel costs for the remainder of the fiscal year, she would be forced to close her office for the remainder of the year. Both parties agreed that closing the clerk's office would result in irreparable harm for which there was no adequate remedy at law.

Finally, the County established a likelihood of success on the merits. To establish a likelihood of success, the County "need only raise a fair question regarding the existence of a claimed right and a fair question that [it] will be entitled to the relief prayed for if the proof sustains the allegations." *Kalbfleisch v. Columbia Community Unit School District Unit No. 4*, 396 Ill. App. 3d 1105, 1114 (2009). Here, the County has raised a fair question regarding the Clerk's obligation to operate her office within budgetary appropriations (55 ILCS 5/6—1005 (West 2008)) and a fair question that she is not paying enough of her office expenses out of the special funds.

The Clerk argues that the special funds may not be used to cover the costs of everyday data entry into the document storage system and the automated recordkeeping system. She asserts that the

statutes authorizing the special funds limit their use to maintaining the systems covered by those special funds and that they exclude the costs of personnel using those systems on a day-to-day basis. We must, therefore, construe the statutes at issue.

The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *Kalbfleisch,* 396 Ill. App. 3d at 1115. The language of the statute is the best indicator of legislative intent, and we should not read into the statute exceptions, limitations, or conditions that do not exist. *Id.* We presume that the legislature did not intend absurd, inconvenient, or unjust results. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 12 (2009).

The instant controversy centers on the language in two statutes, that relating to the Court Automation fund and that relating to the Court Document Storage Fund. The legislature provided that the expense of "establishing and maintaining" automated record keeping systems in the circuit clerks' offices shall be borne by the counties. 705 ILCS 105/27.3a(1) (West 2008). To defray the expense of an automated recordkeeping system, the county board may require the circuit clerk to charge and collect a fee. The fees are remitted monthly to the county treasurer, to be retained by the treasurer in a special fund. Under section 27.3a(3), the county board makes expenditures from the fund in payment of "*any* cost related to the automation of court records, including hardware, software, research and development costs *and personnel related thereto*," provided that the expenditure is approved by the circuit clerk and the chief judge. (Emphases added). 705 ILCS 105/27.3a(3) (West 2008).

The legislature also provided for a special fund related to "establishing and maintaining" a document storage system. 705 ILCS 105/27.3c(a) (West 2008). The circuit clerk collects a fee for this fund and remits the fees to the county treasurer. Section 27.3c(c) provides in relevant part that

the county board shall make expenditures from the fund in payment of "*any* costs relative to the storage of court records, including hardware, software, research and development costs, *and related personnel*," provided that the circuit clerk approves the expenditure. (Emphases added.) 705 ILCS 105/27.3c(c) (West 2008).

The Clerk reads the words "establishing and maintaining" in both statutes to mean that they limit her expenditures to the literal physical upkeep of the systems. She, therefore, has declined to approve expenditures for any other purpose. Indeed, according to the County's evidence, she allocated $0 from the Court Automation Fund to pay the salaries of the deputy clerks who use the automated recordkeeping system .

Contrary to the Clerk's assertion, the plain language of the statutes indicates that personnel costs related to the day-to-day operation of the automated recordkeeping and the document storage systems are properly paid from the special funds. Both statutes provide that *any* cost, but specifically including personnel, is a proper expenditure if it *relates to* the automation of court records or document storage. The language "establishing and maintaining" has to be read more broadly than the Clerk reads it, in light of this subsequent language. Everyday data entry into the systems is necessary to the day-to-day operation of those systems. Thus, the entry of data into the systems "relates to" the systems. To say that the systems can be established and maintained but not function on a day-to-day basis to the benefit of the public and the courts would be to reach an absurd and unjust result. Our conclusion regarding the meaning of this language is bolstered by a 1992 opinion letter from the Illinois Attorney General that specifically stated that the special funds "may be used to compensate data entry personnel who are engaged in entering data into the specific systems to which the fees

relate." 1992 Ill. Att'y Gen. Op. 2. Accordingly, there is a fair question that the Clerk should be allocating more of her personnel costs to the special funds.

The Clerk argues that entering the preliminary injunction in favor of the County failed to preserve the status quo. The Clerk asserts that the status quo would have been properly maintained by having the County continue to fund her office via monies appropriated from the General Revenue Fund, as it had throughout the year. Nonetheless, preserving the status quo is not always a condition of rest; it is sometimes a condition of action that is necessary to prevent irreparable harm. *Kalbfleisch*, 396 Ill. App. 3d at 1118. In the present case, the trial court's determination preserved the status quo by preventing the Clerk's office from closing and by providing that the Clerk may use previously appropriated and available monies in the special funds. As stated, the Clerk has not shown, at this stage of the litigation, that the trial court's determination will result in an improper use of the special funds. The statutes indicate that the County shall direct how the funds are to be used (see 705 ILCS 105/27.3a(3), 27.3c(c) (West 2008)), and it has authorized the use of the special funds. The trial court's preliminary injunction preserves the Clerk's discretion as to how to allocate those funds to various tasks.

The Clerk also argues that the trial court's determination failed to balance the harm. "In balancing the equities, the court must weigh the benefits of granting the injunction against the possible injury to the opposing party from the injunction." *Schweickart v. Powers*, 245 Ill. App. 3d 281, 291 (1993). The Clerk acknowledges that both parties agreed that the funding had to come from somewhere and that closing the Clerk's office was not an option. The question before the court was whether more harm would accrue to the parties through the expenditure of monies from the special funds or from additional appropriations from the General Revenue Fund. The Clerk argues that, if she

is required to pay the remaining 2010 fiscal year personnel costs from the special funds and it is later determined that this violates the statutes, then she would have committed official misconduct by misappropriating and misspending public funds. We find this argument unpersuasive. If it is determined that the remaining personnel costs were erroneously paid out of the special funds, the Clerk will not be guilty of official misconduct, because she would have paid those expenses in response to a court order.

Moreover, the Clerk has not demonstrated that she had no adequate remedy at law. She could have sought a declaration from the trial court that she was entitled to pay personnel costs from the special funds, or she could have applied to the court for relief under section 15 of the Clerks of Courts Act (705 ILCS 105/15 (West 2008)), which provides that a majority of the judges can determine and fix the number of deputy clerks they find necessary to properly maintain the records when it appears to them that there is an insufficient number of persons employed in the Clerk's office. The Clerk cites cases for the proposition that the rules relating to pleading and proof for equitable remedies are relaxed in cases that present novel issues of crucial importance to the administration of justice, but her reliance is misplaced. Those cases involved our supreme court's exercise of original jurisdiction in *mandamus* proceedings.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.