**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230306-U

Order filed February 28, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| RICHARD MACHNICKI, individually and derivatively on behalf of Northstar Foods, Inc., an Illinois Corporation, | ) ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0306 Circuit No. 21-L-199 |
| JOHN NOWOBILSKI; DONNA NOWOBILSKI; and 2601 AMERICAN LANE, INC., an Illinois Corporation, | ) ) ) ) ) | Honorable |
| Defendants-Appellees. | ) ) | Timothy J. McJoynt, Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice McDade and Justice Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1   *Held*: Trial court erred in granting defendants' motion for preliminary injunction where the issuance of the injunction altered the status quo and defendants failed to show a change in status was required due to an extreme emergency or to prevent serious harm.

¶ 2   Plaintiff, Richard Machnicki, appeals from the issuance of a preliminary injunction in favor of defendants, John and Donna Nowobilski and 2601 American Lane, Inc. (collectively

the Nowobilskis and/or defendants), forcing the sale of Northstar, Inc. (Northstar) a meat processing company owned in partnership by John and Richard. On appeal, Richard claims the trial court erred in granting the injunction in defendants' favor because it altered the status quo and ultimately granted defendants relief on the merits of their underlying claim without conducting a full hearing. He also argues the court abused its discretion in finding that defendants satisfied the elements of a preliminary injunction motion. We agree with Richard's first argument and, therefore, reverse and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4        John and Richard are the sole and equal shareholders of Northstar, a federally certified food processing company of deli meats, specialty sausages, and Polish foods in Elk Grove, Illinois. John and Richard formed the company in 2004, both investing $75,000 and agreeing to be 50% partners in the business.

¶ 5        Under the corporate bylaws, Northstar has three directors, Richard, John, and John's wife, Donna. John and Donna serve as the company's president and secretary, respectively, and run the day-to-day operations. Machnicki does not work for Northstar and does not serve as an officer.

¶ 6        At the beginning of the partnership, John and Richard were both paid a salary of $42,000. As the years passed, John and Richard's annual salaries increased to $260,000. Donna did not earn a salary. After several years of success, Northstar grew into a multimillion dollar corporation. In 2015, as the company's profitability continued to expand, John reviewed the records and concluded that Donna should be paid for her day-to-day management services for the previous ten years. He decided to pay her past due compensation over four years (2015-2018), averaging $1,158,000 a year. In 2019, Donna began earning an annual salary of $265,000. In

2

2021, Northstar reported an average annual gross revenue of $25 million and an adjusted "EBITDAR" (earnings before interest, taxes, depreciation, and amortization) of $8.5 million.

¶ 7 Along with its financial growth, Northstar outgrew its production facility, requiring John and Richard to lease additional buildings. Currently, Northstar's production facility is comprised of three leased properties: 2600 Delta Lane and 2575 American Lane, which are owned by John and Richard (2600 Delta, Inc.); and 2601 American Lane, which is owned by John and Donna (2601 American Lane, Inc.).

¶ 8 As the company continued to succeed, relations between John and Richard deteriorated. In 2015, on the advice of his accountant, John stopped paying Richard a salary, claiming that his salary was inappropriate because Richard was not a Northstar employee. In December 2019, after several years of discord, Richard's attorney sent John a written demand to examine the corporate records, pursuant to section 7.75 of the Business Corporation Act of 1983 (Business Corporation Act) (805 ILCS 5/7.75 (West 2018)), stating that he had concerns that John was mismanaging Northstar. He demanded all financial, accounting, and tax records from 2013 to 2019, as well as the Nowobilskis' personal tax returns. The Nowobilskis responded in a letter through counsel and declined to produce the records, claiming that Richard's demand was not proper under the Business Corporation Act. The letter also stated that John was willing to enter into a buy/sell agreement, providing Richard with the right to buy John's ownership in Northstar and its assets based on a valuation by an independent third party.

¶ 9 On February 16, 2021, Richard filed suit against defendants, claiming misuse of corporate funds and seeking access to Northstar's corporate records. He claimed that Northstar "grossly overpaid" for rent at 2601 American Lane and that the Nowobilskis distributed the majority of annual profits to themselves and overcompensated themselves with disproportionate

3

salaries. The complaint contained four claims: (1) a breach of fiduciary duty claim; (2) a derivative claim pursuant to section 12.56 of the Business Corporation Act (805 ILCS 5/12.56 (West 2020)); (3) an accounting claim, requested a complete accounting of Northstar's revenues and expenses, and (4) a petition to inspect the corporate records, requesting the production of corporate and personal records from 2013 to the present. Richard requested numerous remedies, including removing the Nowobilskis from their officer positions, installing himself as the controlling officer, injunctive relief preventing the Nowobilskis from controlling Northstar, and monetary damages. In their answer to the complaint, the Nowobilskis asserted several affirmative defenses, including waiver, notice, unclean hands, reasonableness of rent, and breach of fiduciary duty.

¶ 10    On June 1, 2021, the Nowobilskis filed an emergency motion for a temporary restraining order and preliminary injunction, seeking a restraining order to prevent Richard from entering the plant and a confidentiality order protecting the company's financial information. The motion claimed that Richard was "terrorizing" Northstar and its employees by entering the plant, refusing to wear federally mandated food safety equipment, and yelling at employees. It also alleged that Richad was seeking to review corporate records in an attempt to destroy the company and that he was involved in "some scheme to purchase the Company at a lower price."

¶ 11    Two weeks later, the Nowobilskis filed a two-count counterclaim for (1) trespass onto Northstar property, and (2) declaratory judgment to protect confidential corporate and personal financial records. In support of the trespass claim, they alleged that between March 2021 and June 2021, Richard appeared at the Northstar facility unannounced on several occasions, making verbal threats and entering restricted processing areas without the protective anti-contamination

gear required in violation of United States Department of Agriculture and Food and Drug Administration regulations.

¶ 12    On June 30, 2021, the trial court entered an order granting the Nowobilskis' emergency motion in part and denying it in part. The court granted the restraining order and entered a temporary restraining order that prevented Richard from entering 2601 American Lane through July 14, 2021. However, the court denied defendants' request for an injunction to protect their confidential records based on an agreed confidentiality order drafted by the parties and entered on June 23.

¶ 13    On July 14, 2021, the court entered an agreed order prohibiting Richard from entering Northstar for 60 days. The trial court's order also dismissed, with prejudice, the Nowobilskis' affirmative defenses of notice, reasonableness of rent, and breach of fiduciary duty.

¶ 14    During the ensuing 12 months, Richard continued his pursuit to review the corporate records, and the Nowobilskis refused to produce them. Both parties filed numerous discovery motions citing the confidentiality agreement in support of their positions. The pleadings sought orders to compel, orders of protection, civil contempt findings, and sanctions.

¶ 15    On August 5, 2022, the Nowobilskis received a negotiated letter of intent (LOI) from Stampede Meat, Inc. (Stampede) to purchase Northstar and its assets for $30 million. The purchase of assets included Northstar's trucking company, the two properties owned by John and Richard, and the facility located at 2601 American Lane owned by John and Donna. As specified in the LOI, the aggregate offer of $30 million was comprised of: (1) $22.5 million in cash for Northstar Foods, Inc., the trucking company, and the two properties owned by John and Richard; (2) $1.5 million in cash for the property owned by John and Donna; and (3) $6 million in

rollover equity. The LOI included a due diligence clause stating that Stampede intended to close the sale before September 30, 2022.

¶ 16    In the weeks that followed, the Nowobilskis' attorney notified Richard's attorney of the LOI and requested that Richard sign a non-disclosure agreement (NDA) before reviewing the offer. Richard expressed interest in the LOI, but the parties could not agree on the terms of the NDA. The Nowobilskis refused to provide the LOI, and Richard subsequently rejected the offer.

¶ 17    On August 25, 2022, John filed a countercomplaint entitled "Second Amended Counterclaim," as the only named counterplaintiff.[1] The complaint alleged a single cause of action for shareholder deadlock and sought relief under section 12.56 of the Business Corporation Act (*id.* § 12.56).

¶ 18    On October 31, 2022, the Nowobilskis filed "Defendants' Motion for Preliminary Injunction" against Richard and attached the countercomplaint as an exhibit. The motion made a singular request, seeking the court's assistance "to effectuate the sale of [Northstar] to a third party, or in the alternative to force the sale/purchase of Northstar to one of its 50% shareholders" pursuant to section 12.56 of the Act.

¶ 19    The two-day hearing on the preliminary injunction motion took place on December 20, 2022, and May 11, 2023. At the hearing, the Nowobilskis offered Stampede's CEO, Brock Furlong, as the first witness. Richard objected, asserting that Furlong was never disclosed as a witness. The trial court overruled the objection, stating: "[I]t's a motion for preliminary injunction. There's no disclosures, no discovery. There's ambushes in preliminary hearings."

---

[1] Although John used the title "Second Amended Counterclaim," this was the first countercomplaint he filed naming only himself as the counterplaintiff. It was also the first countercomplaint that alleged deadlock and sought relief under the Business Corporation Act.

¶ 20        Furlong then testified that Stampede is a large food processing company that has annual revenue of approximately $800 million. He met with John to discuss creating a partnership with Northstar. He was very impressed with the plant and John's story of how he built the company from nothing into a multimillion dollar business. After meeting with John, he submitted a letter of intent to the Nowobilskis, offering to purchase Northstar, its assets, and all three properties for an aggregate purchase price of $30 million. The offer was based on a financial summary compiled by Northstar that was presented to him when he met with the Nowobilskis in the summer of 2021. The offer of $30 million was a higher offer than Stampede typically extends, but he thought Northstar had unique brand potential based on its background story and John's personal commitment to the company.

¶ 21        Furlong further testified that due to a lack of certainty of alignment among the shareholders, Stampede never made it to the due diligence stage. The other shareholder would not agree to sell his half of Northstar. Stampede could not purchase 50% of the company; its investors would not allow the company to purchase a business that it did not have total control over. On cross-examination, Furlong stated that he was unaware that a corporate valuation firm had previously valued Northstar at $37 million.

¶ 22        John testified that he has actively worked for Northstar since the company was formed in 2004. He works approximately 80 hours a week, Monday through Sunday, and has grown the company into a national distributor of specialty pork and meat products. He runs the day-to-day operations, handles all of the sales, deals with customer service issues, and is the head chef for sausage production.

¶ 23        Over the past 21 years, John and Richard's business relationship has deteriorated. John has grown frustrated with Richard's failure to contribute to Northstar's daily operations, and

7

Richard continues to insist on more shareholder dividends and salary increases. John further testified that Richard has a history of asking for confidential Northstar documents and then sharing them with the company's competitors. In addition, Richard frequently "shows up" at the Northstar facility unannounced and disrupts business, walking through restricted areas without proper attire and verbally threatening him and Donna in front of customers and employees.

¶ 24    John testified that he is 63 years old and does not wish to continue working. He would like to retire. For years, John has been asking Richard to buy him out, but Richard will not do it. John testified: "He will not buy me out. He doesn't even want to hear that. He doesn't want [any] part of it. He doesn't want to take over." John claimed he offered to buy Richard's shares for $18,500,000, and Richard refused the offer.

¶ 25    During cross-examination, John testified that Stampede offered to purchase Northstar in a letter that required Richard's signature. Richard never got back to Stampede, so Stampede never moved forward with a purchase contract. John thought the $30 million offer from Stampede was fair. However, he admitted that he did nothing to determine if the offer was a fair or accurate purchase price based on the market value. Counsel then elicited the following testimony:

"Q. So Mr. Nowobilski, how much money would you receive from Stampede if this sale were to go through?

A. I—look, I don't have the numbers with me. I never follow[ed] up on that. I'm too busy working. We never went that far to get the details [of] how much money I would get. ***.

Q. Sure. So is there anything preventing you right now from selling your 50 percent shares?

A: No.

8

Q: No. You could sell your shares to anyone you wanted; correct?

A: Correct."

¶ 26      When the hearing resumed on May 11, 2023, John testified that he believed the Stampede offer was an "old number" and that Northstar was worth "at least $40 million." Since December 20, 2022, business profit was "going to the moon," the outlet store was "doing a fabulous job," and business sales had increased "by 40 percent." John testified: "The last estimate we had was at [$]40 million and sales was [$]25 million. Now the sales is going to be over [$]40 million. So th[e] business has got to be over $50 million with buildings. It's –its's—it's booming. It really is doing good."

¶ 27      John further testified that in rejecting Stampede's letter, Richard made an offer to purchase his shares of the business for $15,750,000 plus $1.5 million for 2601 American Lane, Inc., which John rejected. John refused the offer because he believed it was not high enough. He then made a counteroffer in which he offered to sell his shares to Richard for $18,500,000, a sum he maintained was in line with Stampede's $30 million LOI because it included the equity portion of the transaction. Richard declined. John stated that his counteroffer included an option to buy provision, allowing John to buy Richard's 50% share for the same amount if Richard decided not to buy John's shares. As his cross-examination concluded, John admitted that he had a valuation research corporation assess the valuation of Northstar in 2020 and the firm valued the company at $37 million.

¶ 28      Donna testified that Stampede came to them with an offer through a broker; they did not seek out Stampede. She and John thought the $30 million offer was fair but did not do anything to determine if it was reasonable based on the market value. They did not make a counteroffer because Stampede said the offer was final. Donna testified that she could not envision a scenario

where she and John continued working at Northstar with Richard. She stated that Richard "has burned all the bridges between us." Richard did not testify.

¶ 29    The trial court ruled in favor of the Nowobilskis and granted their motion for preliminary injunction. In orally pronouncing its decision, the court noted that it was ruling on a "preliminary injunction pleading" and that "exhibits were never admitted into evidence at this hearing." The court then found that based on the evidence, "[t]here is clear deadlock between the two shareholders of this company as defined in 12.56 of the Business Corporation Act." The court also found that injunctive relief was required and it was not necessary to preserve the status quo: "[T]he status quo is completely unfair to the defendant. That evidence is unrebutted."

¶ 30    Relying on *Osaghae v. Oasis Hospice & Palliative Care, Inc.*, 2021 IL App (1st) 200515, the trial court held that the Business Corporation Act permitted a forced sale of shares of a closely held corporation for fair value. The court concluded that it "heard evidence that a *bona fide* offer was made to sell this company with all of its holdings for $30 million" and ordered Richard to sell his shares to John for $17.5 million. After two hearings to clarify, the court memorialized its findings in a written order, stating in part:

> "A. The Court finds that the fair value of [Northstar] and those other entities included on the Letter of Intent dated August 25, 2022[,] from Stampede Meats presented to the Court, specifically JR Trucking of Illinois, LLC.[,] 2600 Delta, Inc., 2601 American Lane, Inc., (collectively in addition to Northstar being referred to as the "Company") is $35 million. Thus, each Party's interest in the Company is valued at $17.5 million.

10

B. Within 20 days of the entry of this Order, Defendant will pay to Plaintiff, $1 million dollars—the first installment of the total purchase price of $17.5 million—for Plaintiff's interests in the Company.

C. After receiving the first installment, Plaintiff, Richard Machnicki, will immediately convey all of his shares in the Company to the Defendant, John Nowobilski. This is a preliminary injunction, and no bond will be required for this injunctive relief, but an escrow will be established as set forth below.

D. Defendant shall pay the remaining $16.5 million installment to Plaintiff for Plaintiff's interests in the Company within 30 days of receipt of Defendant's shares.

E. If Defendant is unable or unwilling to purchase Plaintiff's interest within 20 days of this Order, the Company will be marketed for sale. John Nowobilski will be solely responsible for this activity and shall have sole authority to decide or negotiate any offers, manage due diligence, or accept an offer for sale of the Company to a third party so long as if the Company is purchased by a third-party, both parties receive equal shares of the net sale proceeds.

F. Defendant will keep the Plaintiff informed as to all activity relating to the sale of the business. Plaintiff will supply Defendant with an appropriate working e-mail address so Defendant can keep Plaintiff apprised of these activities.

G. Defendant will be in sole control of running the Company during this period of time and shall continue to pay fair compensation to both Parties and all employees until the Company is sold. Defendant shall inform the Plaintiff of business activities until further order of Court.

H. If Plaintiff holds any office, he is now removed from that office per Illinois Business Corporations [*sic*] Act §12.56(b)(3).

I. In accord with the prior Court order issued in this matter on July 14, 2021, Plaintiff shall not enter onto the premises of the Company.

J. Defendant shall not make any distributions from the Company to either party until further order of Court.

K. Once Plaintiff's interest has been purchased by Defendant or the Company has been sold to a third party, the preliminary injunction will be effectively dissolved."

¶ 31    The trial court granted Richard's motion to stay enforcement of the injunction pending appeal. He now appeals the court's order pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017).

¶ 32                                   II. ANALYSIS

¶ 33    On appeal, Richard claims that (1) the trial court erred in granting the injunction in defendants' favor because it altered the status quo and ultimately granted defendants relief on the merits of the underlying claim without conducting a full hearing, and (2) the court abused its discretion in concluding that defendants satisfied the elements of a preliminary injunction motion. We find the failure to maintain the status quo dispositive and limit our discussion to the first issue.

¶ 34    Preliminary injunctions are "an extraordinary remedy, and courts do not favor their issuance." (Internal quotation marks omitted.) *Guns Save Life, Inc. v. Raoul*, 2019 IL App (4th) 190334, ¶ 36. As such, Illinois courts have clearly stated that preliminary injunctions "should be granted only in situations of extreme emergency or where serious harm would result if the preliminary injunction was not issued." *Id.*; see also *World Painting Co. v. Costigan*, 2012 IL App

12

(4th) 110869, ¶ 11; *Clinton Landfill, Inc. v. Mahomet Valley Water Authority*, 406 Ill. App. 3d 374, 378 (2010).

¶ 35 The primary purpose of a preliminary injunction is "to preserve the status quo pending a decision on the merits of a cause." *Postma v. Jack Brown Buick, Inc.*, 157 Ill. 2d 391, 397 (1993). It does not determine the controverted rights or decide the merits of the case but, rather, preserves the state of affairs until a final judgment can be rendered. *Kalbfleisch ex rel. Kalbfleisch v. Columbia Community Unit School District Unit No. 4*, 396 Ill. App. 3d 1105, 1112 (2009). Thus, a party requesting injunctive relief must show that it has raised a fair question about the existence of a protectable right "*and* that the court should preserve the status quo until the case can be decided on the merits." (Emphasis added.) *Buzz Barton & Associates, Inc. v. Giannone*, 108 Ill. 2d 373, 382 (1985). The status quo is "the last, actual, peaceable, uncontested status which preceded the pending controversy." *Postma*, 157 Ill. 2d at 397.

¶ 36 In issuing a preliminary injunction, courts should maintain the status quo with the least injury to the parties concerned. *Guns Save Life*, 2019 IL App (4th) 190334, ¶ 67. "[C]ourts should consider the status quo as it affects both parties, not merely the party seeking injunctive relief." *Id.* Moreover, a preliminary injunction should go no further than is essential to safeguard the parties' rights. *Id.* ¶ 64. If granting a preliminary injunction creates an irreversible change in status between the parties, the preliminary injunction motion should be denied. See *Village of Riverdale v. American Transloading Services*, 2023 IL App (1st) 230199-U, ¶¶ 26-27 (finding trial court abused its discretion in granting preliminary injunction that caused defendant's business to permanently close).

¶ 37 We review the trial court's grant or denial of a preliminary injunction for an abuse of discretion, which occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no

13

reasonable person would adopt the trial court's view. *JL Properties Group B, LLC v. Pritzker*, 2021 IL App (3d) 200305, ¶ 58. Failure to apply the proper test or consider the appropriate criteria may itself be an abuse of discretion. *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006).

¶ 38　　　　Richard first argues the trial court abused its discretion in issuing the preliminary injunction in defendants' favor because it altered the status quo of Richard and John's ownership of Northstar. We agree. For Richard and John, their last status before the litigation in this case was a 50/50 partnership in Northstar, each owning equals shares of the close corporation. In granting the motion for preliminary injunction, the court altered the status quo by forcing Richard to convey all of his Northstar shares to John for a third-party sale or to purchase himself. The order also changed the status of several entities Richard and John owned in partnership and forced Richard to sell his interest in those businesses, as well. The preliminary injunction in this case did more than alter the state of affairs between Richard and John; it drastically transformed the parties' business relationship.

¶ 39　　　　In certain circumstances, altering the status quo in granting a preliminary injunction may be appropriate. For example, a preliminary injunction that alters the status quo may be granted in situations of "extreme emergency" or to prevent "serious harm." See *Clinton Landfill*, 406 Ill. App. 3d at 378. However, in this case, the evidence failed to indicate that an alteration was warranted. Testimony elicited at the preliminary injunction hearing revealed that Northstar was thriving. John testified that between December 2022 and May 2023 profits had increased by 40%. None of the evidence suggested that the company was failing, or that the corporate assets were declining in value. Simply put, the evidence did not demonstrate that an extreme emergency existed or that a forced sale was needed to prevent serious harm to the company.

14

¶ 40        Furthermore, the trial court failed to consider the status quo of both parties. Although maintaining the status quo could arguably further the irreparable injury to defendants by preventing the sale of Northstar to a third party, granting the preliminary injunction could similarly cause irreparable injury to Richard since he would no longer have any interest in the company and would forfeit his shares without a fair value determination. The Nowobilskis claim that trial court considered the effective of the injunction on the parties and that a forced sale of Northstar was necessary to prevent the continued oppression of John's shares, but John's testimony that nothing prevented him from selling his shares of the company without Richard's approval belies that argument. Accordingly, the court's preliminary injunction order, altering the status quo without supporting evidence of extreme emergency or serious imminent harm was an abuse of discretion.

¶ 41        The Nowobilskis argue that even if the trial court's order altered the status quo, a reversal is not required, citing *Kalbfleisch*, 396 Ill. App. 3d at 1118-19, and *Lakeshore Hills, Inc. v. Adcox*, 90 Ill. App. 3d 609, 611-12 (1980).

¶ 42        We find both cases distinguishable. In *Kalbfleisch*, the trial court granted an autistic student a preliminary injunction, allowing him to attend school with his service dog. *Kalbfleisch*, 396 Ill. App. 3d at 1120. On appeal, the school district argued the injunction disturbed the status quo because the student had not previously attended school with the service dog. *Id.* at 1118. The appellate court found the preliminary injunction appropriate, holding the student would otherwise have "no avenue to prevent suffering irreparable harm" and finding "[a] probable violation of law should never be the status quo." *Id.* at 1118-19. In *Adcox*, the trial court granted the plaintiff's request for a preliminary injunction and altered the status quo by ordering the defendant to remove an 875-pound pet bear from a subdivision. *Adcox*, 90 Ill. App. 3d at 611.

15

The appellate court ruled that although the injunction altered, rather than preserved, the status quo, it was necessary because the captive bear violated the subdivision's covenant and seriously threatened the public. *Id.* at 611-12. These cases approved preliminary injunctions that altered the status quo because leaving the parties in their last status preceding the controversy violated the law or posed a serious danger. Neither exists here; Richard's continued ownership of 50% of the shares of Northstar is not a violation of the law, nor does it present a danger to the public.

¶ 43 In the alternative, the Nowobilskis urge this court to affirm the trial court's order as a permanent order granting injunctive relief. In insisting that the court's order forcing the sale of Northstar was appropriate, the Nowobilskis maintain the trial court "exercised its broad discretion in fashioning appropriate injunctive relief under the Illinois Business Corporations [*sic*] Act," emphasizing the court's discretion to address shareholder deadlock and force the sale of the corporation under sections 12.56(b) and 12.60(d) of the Act. See 805 ILCS 5/12.56(b)(11) (West 2020) (relief the court may order includes "the purchase by the corporation or one or more other shareholders of all, but not less than all, of the shares of the petitioning shareholder for their fair value and on the terms determined under subsection (e)"); *id.* § 12.60(d) (the court "may issue injunctions, appoint an interim receiver *** , and take such other action as is necessary or desirable to preserve the corporate assets and carry on the business of the corporation until a full hearing can be had"). They also claim that the court's order was appropriate because Richard failed to present a case and "has unclean hands."

¶ 44 The Nowobilskis' arguments seem to suggest, if not admit, that in issuing the injunctive order, the trial court entered a final ruling on the merits of their underlying claim. Defendants even characterize the court's hearing as a "full hearing on the merits." However, a preliminary injunction hearing is *preliminary*; it is not a full hearing on the merits. And the record clearly

16

shows that the trial court did not conduct the hearing under the misconception that it was a full hearing on the merits. The Nowobilskis' moved for a preliminary injunction; the parties presented arguments in support and opposition to a preliminary injunction; and the trial court conducted the hearing as a preliminary proceeding. Indeed, at the hearing and in its written order, the court referred to the motion and the hearing as "preliminary injunction" proceedings. The court also refused to enforce rules of discovery based on the preliminary nature of defendants' motion. See *Buzz Barton*, 108 Ill. 2d at 386 (at the preliminary injunction stage, the movant "need not carry same burden of proof that is required to support the ultimate issue"). The record demonstrates that the trial court conducted a preliminary injunction hearing.

¶ 45        Assuming, *arguendo*, the court held a full hearing on the merits, reversal would still be required. "The purpose of a purpose of a preliminary injunction is to preserve the status quo pending a decision on the merits of a cause." *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 156 (1992). As such, in ruling on a motion for preliminary injunction, "controverted facts on the merits of the case are not decided." *Id.* Illinois law is clear that it is "serious procedural error" to treat a hearing on a motion for preliminary injunction as a "full scale hearing on the merits and permanently dispose[ ] of all pending matters." *Nopolous v. McCullough*, 95 Ill. App. 3d 852, 853 (1981).

¶ 46        The inherent problem with the ruling in this case is that defendants' motion for a preliminary injunction did not seek to preserve Northstar's state of affairs. Instead, it asked for the same relief on an interim basis as John had requested his counterclaim, asserting deadlock and seeking to force the sale of the company. In turn, the trial court's order granting the injunction compelled Richard to sell his all of his shares of Northstar to John and allowed John to sell the company to an unidentified third-party or, in the alternative, purchase the shares

17

himself for $17.5 million. The court erred in reaching this decision without a full hearing to determine the fair value of the company's closely held shares pursuant to the Business Corporation Act. See 805 ILCS 5/12.56(e) (West 2020) ("If the court orders a share purchase, it shall: (i) Determine the fair value of the shares, with or without the assistance of appraisers, taking into account any impact on the value of the shares resulting from the actions giving rise to a petition under this Section[.]").

¶ 47    We have found no Illinois case where the court forced the sale of a close corporation in a preliminary injunction proceeding. Even the cases defendants cite (and one that the trial court relied on) establish that a forced sale of closely held shares of a corporation requires a full hearing on the merits. See *Osaghae*, 2021 IL App (1st) 200515; *Shawe v. Elting*, 157 A.3d 152 (Del. 2017). In *Osaghae*, the court ordered the forced sale of shares of a close corporation under section 12.56 of the Business Corporation Act after a jury trial and after taking into consideration the evidence adduced at the trial in a final hearing. The appellate court emphasized that the record showed the court conducted "an evidentiary trial on the merits concerning the issues raised in [the deadlock] counterclaim." *Osaghae*, 2021 IL App (1st) 200515, ¶ 105. Likewise, in *Shawe*, the trial court ordered a forced sale of a company "[h]aving conducted a six-day trial, decided at least sixteen motions, held numerous lengthy hearings, and considered carefully the documentary evidence and credibility of the witnesses along with the parties' extensive submissions." *Shawe*, 157 A.3d at 160.

¶ 48    In sum, we conclude that the trial court abused its discretion in granting defendants' motion for preliminary injunction by altering the status quo and remand for further proceedings. See *Guns Save Life*, 2019 IL App (4th) 190334, ¶ 67 ("[W]hen a preliminary injunction is denied, the [movant] still has an avenue for relief in the ultimate disposition of the case."). In so

doing, we make no judgment as to the final merits of Richard's claims, nor do we suggest that forcing the sale of Northstar shares is an inappropriate resolution to the parties' deadlock. Instead, we emphasize that preliminary injunctions are "extreme" remedies that may be issued in the interim to preserve the status quo and should only alter the state of affairs in emergency situations that pose serious harm. Defendants failed to allege facts supporting such a situation, and therefore, the trial court abused its discretion in granting a preliminary injunction.

¶ 49                                III. CONCLUSION

¶ 50        The judgment of the circuit court of Du Page County is reversed, and the cause is remanded for further proceedings.

¶ 51        Reversed and remanded.